**REPUBLICAN NATIONAL COMMITTEE, National Republican Senatorial Committee and National Republican Congressional Committee, Appellants,**

v.

**FEDERAL ELECTION COMMISSION, Appellee.**

**No. 94–5248.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 1995.

Decided Feb. 20, 1996.

Jan W. Baran, Washington, DC, argued the cause, for appellants, with whom Thomas W. Kirby was on the briefs.

Richard B. Bader, Associate General Counsel, Federal Election Commission, Washington, DC, argued the cause, for appellee, with whom Lawrence M. Noble, General Counsel, and David B. Kolker, Attorney, Federal Election Commission, were on the brief. Vivien Clair, Attorney, Federal Election Commission, entered an appearance for appellee.

Before: EDWARDS, Chief Judge, SENTELLE and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

Opinion concurring in part and dissenting in part filed by Circuit Judge SENTELLE.

TATEL, Circuit Judge:

At issue in this appeal is a Federal Election Commission regulation interpreting what political committees must do under the Federal Election Campaign Act to demonstrate that they have exercised their "best efforts" to encourage donors to disclose certain personally identifying information. For more than a decade, the Commission considered a political committee to have exercised "best efforts" if the committee made a clear request for the information in its initial solicitation for funds. Concerned about low reporting rates, the Commission issued the regulation that is the focus of this appeal. This new regulation requires political committees to send a follow-up request to donors who fail to supply the information in response to the original solicitation; requires the inclusion of a statement that federal law obligates political committees to report the information to the FEC; and prohibits committees from including in the follow-up request any material other than the request for the information, the mandatory statement, and an expression of gratitude for the contribution. Finding the new regulation not contrary to the Act, arbitrary or capricious, or inconsistent with the First Amendment, the district court granted summary judgment for the Commission. We agree with the district court as to the requirement of a stand-alone follow-up request. Because the language of the mandatory statement is inaccurate and misleading, however, we conclude that this portion of the regulation is contrary to the statute.

## I.

The Federal Election Campaign Act, first enacted in 1971, requires the treasurer of a political committee to report to the Federal Election Commission the name, address, occupation, and employer of donors giving more than $200 in a single year. 2 U.S.C. §§ 431(13), 434(b)(3)(A) (1994). Neither the Act nor any other law, however, requires donors to disclose this information.

In *Buckley v. Valeo*, 424 U.S. 1, 60–84, 96 S.Ct. 612, 654–666, 46 L.Ed.2d 659 (1976), the Supreme Court upheld the political committee reporting requirement against a First Amendment challenge. Applying "exacting scrutiny," *id.* at 64, 96 S.Ct. at 656, the court sustained the requirement as "appear[ing] to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist," *id.* at 68, 96 S.Ct. at 658.

In 1976, Congress amended the Act by adding the following provision:

When committee treasurers and candidates show that *best efforts* have been used to obtain and submit the information required by this subsection, they shall be deemed to be in compliance with this subsection.

Federal Election Campaign Act Amendments of 1976, Pub.L. No. 94–283, 90 Stat. 475, 480 (formerly codified at 2 U.S.C. § 434(b) (1976)) (emphasis added). Congress did not define the term "best efforts"; nor did it do so three years later when it recodified the "best efforts" provision, deleting "candidates" as persons to whom the provision applied, but leaving the remaining language essentially intact. Federal Election Campaign Act Amendments of 1979, Pub.L. No. 96–187, 93 Stat. 1339, 1347 (formerly codified at 2 U.S.C. § 432(i) (1976 & Supp.1979)).

Soon after the 1979 amendments became effective, the Commission issued a regulation that for the first time interpreted "best efforts." 11 C.F.R. § 104.7 (1981 ed.). According to the regulation, if a political committee failed to report identifying information for a contributor whose gifts exceeded the $200 annual threshold, the committee could satisfy the "best efforts" provision by showing that its original solicitation, whether written or oral, included "a clear request" for the information that "inform[ed] the contributor that the reporting of the information is required by law." § 104.7(b).

Over a decade later, dissatisfied with the extent to which political committees were obtaining the requested information from

contributors, the Commission gave notice that it intended to revise and strengthen the 1980 "best efforts" regulation. 57 Fed.Reg. 44, 137 (1992). After public comment and hearing, the Commission issued a regulation providing that political committees would "only be deemed to have exercised best efforts" if, in addition to their request in the initial solicitation, they made a separate follow-up request to those contributors not disclosing all the information. *See* 58 Fed.Reg. 57,725, at 57,729 (Oct. 27, 1993) (codified at 11 C.F.R. § 104.7(b) (1994)). The new regulation provides that the follow-up request, like the request in the original solicitation, can be either oral—if documented in writing—or written. 11 C.F.R. § 104.7(b)(2). Both the original solicitation and the follow-up request must include, in a "clear and conspicuous manner," the following statement:

> Federal law requires political committees to report the name, mailing address, occupation and name of employer for each individual whose contributions aggregate in excess of $200 in a calendar years [sic].

11 C.F.R. § 104.7(b)(1)–(2). According to the regulation, the follow-up request may not contain anything other than the request for the missing information, the mandatory statement, and an expression of gratitude. The new regulation became effective on March 3, 1994.

Presenting both statutory and constitutional arguments, the Republican National Committee, the National Republican Senatorial Committee, and the National Republican Congressional Committee—the primary political committees of the Republican Party at the national level—challenged the Commission's new regulation in the United States District Court for the District of Columbia. They claimed that the plain language and legislative history of the "best efforts" provision, as well as the Commission's previous interpretations of it, made clear that Congress intended to require no more than one request for the identifying information. Arguing that the Commission had failed to give a reasoned explanation for its new regulation, the Committees challenged the regulation as arbitrary and capricious in violation of the

Administrative Procedure Act. 5 U.S.C. § 706(2)(A) (1994). The Committees also argued that the mandatory statement, the prohibition of additional "speech" in the follow-up request, and the regulation's alleged financial and administrative burdens, violate the First Amendment.

The district court granted summary judgment for the Commission. It found the regulation consistent with the Act and adequately justified by the Commission. *Republican Nat'l Comm. v. Federal Election Comm'n*, No. 94–1017, slip op. at 7–10 (D.D.C. July 22, 1994). Relying on *Buckley v. Valeo*, the district court also rejected the Committees' First Amendment challenges, finding the regulation narrowly tailored to achieve the compelling interest of disclosing information about political contributors. *Id.* at 10–14. Repeating the arguments they advanced in the district court, the Committees appeal.

## II.

■ The Committees' challenge to the regulation as contrary to the language, purpose, and legislative history of the "best efforts" provision of the Act presents us with a typical *Chevron* issue. *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Using "traditional tools of statutory construction," we first examine whether the statute "directly [speaks] to the precise question at issue." *Id.* at 842 & n. 9, 104 S.Ct. at 2781 & n. 9. If so, we follow the statute's instructions. If the statute "has not directly addressed the precise question at issue," we defer to the agency's interpretation if it is reasonable. *Id.* at 843, 104 S.Ct. at 2782.

■ We note at the outset that the Committees do not challenge the Commission's authority to issue regulations defining "best efforts," and with good reason: the statute clearly authorizes the Commission to issue implementing regulations. 2 U.S.C. § 438(a)(8); *see also Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981) (noting the FEC's broad rulemaking authority). Although the Commission certainly could have chosen to judge "best efforts" on a case-by-case basis, we

have no doubt that it is equally authorized to interpret the term through rulemaking. *See New York State Comm'n on Cable Television v. FCC,* 749 F.2d 804, 813 (D.C.Cir.1984) ("The decision whether to proceed by rulemaking or adjudication lies within the [agency's] discretion.").

■ Beginning with the statute's language, as we do in all *Chevron* cases, we find nothing in the phrase "best efforts" to preclude the Commission from requiring committees to make more than one request for the information. Inherently general and open-ended, the phrase "best efforts" is well-suited for administrative refinement. Had Congress intended to limit the Commission to requiring a single request, it certainly could have made this clear.

The Committees claim to find the requirement of a single request in the Act's legislative history. They point to a report of the Committee on House Administration accompanying the 1979 amendments. Noting that "[t]he best efforts test is crucial since contribution information is voluntarily supplied by persons who are not under the control of the committee," that report advises:

> If the committee made an effort to obtain the information in the initial solicitation and the contributor ignored the request, the Commission should not require the committee to make the same request two, three, or four times. On the other hand, if the best efforts test is not met, the committee must be required to take corrective action, such as contacting the contributor and requesting the information.

H.Rep. No. 96–422, 96th Cong., 1st Sess. 14 (1979), U.S.Code Cong. & Admin.News 1979 at 2860, 2874. According to the Committees, this language proves that Congress intended to limit the Commission to requiring a single request. We disagree. For one thing, because the 1979 "best efforts" provision carried over the 1976 provision without substantial change, the House report is essentially post-enactment history, carrying little probative weight. *See Democratic Congressional Campaign v. Federal Election Comm'n,* 831 F.2d 1131, 1134 (D.C.Cir.1987) (discounting floor statements regarding judicial review provisions of Federal Election Commission

Act Amendments of 1979 in part because the provisions "carried over without substantive change" an earlier provision). Moreover, the report never defines "best efforts." Although referring to "an effort ... in the initial solicitation," it fails to say whether that effort satisfies the "best efforts" test. While stating that the Commission should not require a committee to make the "same request" repeatedly, the report goes on to state that "if the best efforts test is not met, the Committee must be required to take corrective action, such as contacting the contributor and requesting the information." The report is thus insufficiently clear to limit the open-ended phrase "best efforts" to a single request.

Nor do we find support for the Committees' argument in the legislative history of the original 1976 Act. When introducing the "best efforts" provision, the sponsoring senator said only that it was an "anti-nit-picking amendment," which "merely says that if a finding is made that they tried in good faith to try to comply with the law they shall not be harassed." 122 Cong.Rec. 7922–23 (1976) (statement of Sen. Packwood). Stating that a "good faith effort" is "not quite enough," the same senator explained that "[y]ou cannot use the standard, 'I did not know because I did not ask.'" *Id.* Nothing in these statements limits "best efforts" to a single request.

■ Relying on comments of several FEC Commissioners during a meeting on the proposed 1980 regulation, the Committees next argue that the Commission itself interpreted "best efforts" to allow no more than one clear request. The Committees point out that in that meeting, the Commission, abandoning a proposal to require a follow-up request, decided instead to require only one request in the initial solicitation. According to the transcript of the meeting, some Commissioners believed that a single initial request would respond to Committee staff concerns. But whether these Commissioners thought the statute *mandated* only one request, or even whether their views were shared by other Commissioners, is not at all clear. In the end, however, none of this is relevant because even if in 1980 the Commission had

interpreted the House Report to require only one clear request, such an interpretation would not bind us for purposes of *Chevron* step-one analysis. *Cf. International Bhd. of Elec. Workers v. NLRB*, 814 F.2d 697, 707–08 (D.C.Cir.1987) (holding that court need not sustain agency interpretation that was based, not on agency's judgment, but on its erroneous interpretation of statute).

Thus unpersuaded by the Committees' *Chevron* step-one arguments, we next ask whether the Commission's interpretation of "best efforts" is reasonable "in light of the language, legislative history, and policies of the statute." *Natural Resources Defense Council v. United States EPA*, 822 F.2d 104, 111 (D.C.Cir.1987); *see also Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782. Examining again the statute and its legislative history, we find no basis for questioning the reasonableness of requiring a stand-alone follow-up request. As we have already concluded, nothing in the statute or its legislative history limits the Commission to requiring a single request, or precludes the Commission from requiring a follow-up. The Commission adopted the regulation to further the Act's purposes: gathering donor information to inform the electorate of the sources of campaign money and to deter corruption. *See Buckley*, 424 U.S. at 67–68, 96 S.Ct. at 657–58. Finding that political committees were not collecting sufficient data, the Commission concluded that an uncluttered follow-up request would yield more information. Although the Commission's interpretation of "best efforts" to permit a stand-alone follow-up requirement is not "the only plausible one," *Natural Resources Defense Council*, 822 F.2d at 117, it reflects a reasonable reading of the statute.

■ We are equally unpersuaded by the Committees' argument that the follow-up request is unreasonable because, for more than a decade, the Commission had consistently required only one clear request. As the Court stated in *Chevron*, "[a]n initial agency interpretation is not instantly carved in stone." 467 U.S. at 863, 104 S.Ct. at 2792. "[T]o engage in informed rulemaking," the Court observed, an agency "must consider varying interpretations and the wisdom of its

policy on a continuing basis." *Id.* at 863–64, 104 S.Ct. at 2792. That is exactly what the Commission did here. The mere fact that the Commission changed the prior regulation does not make the new regulation an unreasonable construction of the statute.

■ We reach a different conclusion as to the regulation's mandatory statement. The required language—that "[f]ederal law requires political committees to report the name, mailing address, occupation and name of employer for each individual" contributing more than $200 a year—is inaccurate and misleading. The statute does *not* require political committees to report the information for "each" donor. It only requires committees to use their *best efforts* to gather the information and then report to the Commission whatever information donors choose to provide. Moreover, because the regulation requires committees to use the mandatory statement to satisfy the "best efforts" standard, the statement's inaccuracy could produce unreasonable and wholly unauthorized results. If instead of sending out the mandatory statement, for example, a political committee used a more accurate explanation of the law—such as, "federal law requires us to use our best efforts to collect the information"—or even a direct quote from the statute, the Commission would presumably find the committee not to have exercised its "best efforts." We simply do not believe that Congress authorized the Commission to forbid political committees from accurately stating the law.

The mandatory statement suffers from a second, related defect: its inaccurate characterization of the law may lead unsuspecting donors to believe that they *must* supply the requested information. Federal law, however, does *not* so require. The law only requires political committees to *ask* donors for the information; no federal law requires *donors* to report their name, address, occupation, and employer as a condition of supporting the political party of their choice. Although the mandatory statement's language may well produce higher reporting rates, we doubt that Congress authorized the Commission to accomplish this purpose by misleading donors. The mandatory

statement is thus unreasonable and contrary to the statute.

### III.

█ In addition to their *Chevron* arguments, the Committees challenge the "best efforts" regulation as arbitrary and capricious in violation of the Administrative Procedure Act. Because we have already invalidated the mandatory statement, we focus here on the Committees' challenge to the stand-alone follow-up request. Echoing their *Chevron* arguments, the Committees contend that the Commission reversed its long-standing interpretation without providing a reasoned explanation.

█ Because the Commission changed its regulation, our task is to determine whether the Commission based its new regulation on "reasoned analysis." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983). Our inquiry here overlaps somewhat with our *Chevron* step-two analysis. *See Arent v. Shalala,* 70 F.3d 610, 616 n. 6 (D.C.Cir.1995) ("[W]hether an agency action is 'manifestly contrary to the statute' is important both under *Chevron* and under *State Farm.*"). At the same time, however, a permissible statutory construction under *Chevron* is not always reasonable under *State Farm:* "we might determine that although not barred by statute, an agency's action is arbitrary and capricious because the agency has not considered certain relevant factors or articulated any rationale for its choice," *Arent,* 70 F.3d at 620 (Wald, J., concurring in the judgment). Although we may not substitute our judgment for the Commission's, *see Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), we consider whether the agency has "examin[ed] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2866 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). Not "particularly demanding," this requirement is satisfied if the agency " 'en-

able[s] us to see what major issues of policy were ventilated ... and why the agency reacted to them as it did.' " *Public Citizen, Inc. v. Federal Aviation Admin.,* 988 F.2d 186, 197 (D.C.Cir.1993) (ellipsis in original) (quoting *Automotive Parts & Accessories Ass'n v. Boyd,* 407 F.2d 330, 338 (D.C.Cir. 1968)).

With these principles in mind, we examine the Commission's justification for its new regulation. Our starting point is the Commission's initial request for public comment on its proposal to require a "separate and distinct" follow-up request "with an accompanying notice of the reporting requirement." 57 Fed.Reg. at 44,137–38. According to the notice of proposed rulemaking, the Commission felt that strengthening the "best efforts" regulation was necessary because "weaknesses in the current ... regulations appear to have led to a significant percentage of incomplete itemizeable contributions for some committees." *Id.*

Fourteen groups, including the RNC, submitted written comments on the proposed regulation; six witnesses, again including the RNC, testified at a public hearing; and the Commission surveyed 200 randomly selected committees, each having at least forty donors contributing in excess of $200 per year. Responses were mixed as to the efficacy of the proposed regulation, its cost and burden, and the Commission's statutory authority to change the rules. Several witnesses and commenters shared the Commission's concern about low levels of donor compliance. One group claimed that the political committees of the 1992 Republican and Democratic presidential candidates failed to report information for "well over half of their large individual contributions." Another group claimed that "millions of dollars in campaign contributions pass through the system undocumented."

Witnesses disagreed about both the cause of low donor response rates and the appropriate solution. According to several witnesses, low donor response rates were the responsibility of political committees who lacked the will to collect the information or whose efforts were entirely inadequate. The RNC acknowledged that "it may well be that

some campaigns make a more serious effort to achieve a higher degree of compliance than others." One witness revealed that some committees put their requests for donor information in small print, or buried them among other material. Another group testified that it had increased the number of donors providing identifying information from 30 percent to about 67 percent by making follow-up requests. At least two groups urged the Commission to go beyond a follow-up request and require political committees to return all contributions lacking the required information with a request that donors resubmit the contribution with the identifying information.

Not all witnesses thought that political committees were responsible for low response rates. One witness testified that low rates stemmed from resistance by contributors. This witness urged the Commission to direct political committees to emphasize that the statute required the reporting of donor information. Agreeing that resistance by contributors was the problem, other groups argued that the proposed regulation would not substantially increase response rates.

Survey responses were equally mixed. Twenty-six of seventy-four respondents listed follow-up phone calls "solely devoted to obtaining the missing information" as their most successful method for obtaining donor information. Twenty-five of seventy-four listed follow-up letters solely devoted to obtaining the information as most successful. At the same time, twenty-one of seventy-four respondents listed follow-up letters solely devoted to obtaining the information as *least* successful.

Assessments of the costs of compliance also conflicted. Several witnesses were concerned about the staff time, resources, and money required to comply. The RNC estimated $5 to $6 for each follow-up request. By comparison, another witness estimated "at least 50 cents per letter." Nineteen of seventy-four survey respondents felt that a stand-alone follow-up phone call would impose an "unreasonable expense"; fourteen said that a stand-alone follow-up letter would be unreasonable.

In its testimony and written comments before the Commission, the RNC argued, as it does here, that the proposed "best efforts" regulation exceeded the Commission's statutory authority. Others disagreed, arguing that nothing in the statute or its legislative history prohibited the follow-up requirement.

Following the comment period and the public hearing, the Commission published its new regulation, explaining that "[a]fter careful consideration of the full legislative history," it had concluded that the statute does not "preclude [the Commission] from requiring that committees take additional measures when the information ... is not forthcoming." 58 Fed.Reg. at 57,728. Stating that it had "weighed ... the cost, burdensomeness, and effectiveness of various modifications to the regulations," the Commission concluded that the new regulation would impose minimal burdens. *Id.* at 57,726.

Based on the evidence before the Commission—that certain political committees had low reporting rates, that an uncluttered follow-up request would encourage greater disclosure, and that compliance costs were not unreasonable for most committees—we find that the Commission's requirement of a stand-alone follow-up request resulted from reasoned analysis. We have no trouble seeing "what major issues of policy were ventilated" or why the Commission "reacted to them as it did." *Public Citizen,* 988 F.2d at 197. We are equally satisfied that the Commission's discussion of the legislative history adequately responded to the RNC's challenge to the Commission's authority to promulgate the new regulation. Because the Commission had adequate justification for its new regulation, the fact that some groups opposed the follow-up request does not, as the Committees argue, render the requirement arbitrary and capricious. In the end, the Commission's new regulation results from exactly the kind of agency balancing of various policy considerations to which courts should generally defer. *See Hinson v. National Transp. Safety Bd.,* 57 F.3d 1144, 1151 (D.C.Cir.1995). Congress gave the Federal Election Commission, not this court, responsibility for determining the most effective techniques for obtaining donor information.

We turn finally to the Committees' argument that we should construe the statute to invalidate the Commission's stand-alone follow-up requirement in order to avoid what they argue are "substantial" First Amendment questions. Committees' Brief at 32. Their argument rests on the proposition that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988); *see also Rust v. Sullivan,* 500 U.S. 173, 190–91, 111 S.Ct. 1759, 1770–71, 114 L.Ed.2d 233 (1991). This canon of statutory construction is based on "the prudential concern that constitutional issues not be needlessly confronted," *DeBartolo Corp.,* 485 U.S. at 575, 108 S.Ct. at 1397, and on "respect for Congress, which we assume legislates in light of constitutional limitations," *Rust,* 500 U.S. at 191, 111 S.Ct. at 1771.

We applied this canon most recently in *Chamber of Commerce of the United States v. FEC,* 69 F.3d 600, 604–05 (D.C.Cir.1995). That case involved a challenge to an FEC regulation defining the term "members" for purposes of political communications and solicitations by membership organizations. Finding that the Commission's regulation presented "grave constitutional issues," *id.* at 604, we declined *Chevron* deference. We think the present case is quite different. Because we can easily resolve the Committees' First Amendment challenges through the application of controlling precedent (see Section IV below), we do not face the sort of serious constitutional questions "that would lead us to assume Congress did not intend to authorize [the regulation's] issuance." *Rust,* 500 U.S. at 191, 111 S.Ct. at 1771.

### IV.

■ The Committees focus their First Amendment arguments primarily on the mandatory statement that we have already invalidated. We thus consider only their First Amendment challenge to the stand-alone follow-up request. According to the Committees, this requirement burdens constitutionally-protected political solicitation by forcing them to incur additional costs to send out additional messages.

The simple answer to the Committees' argument is *Buckley's* holding that the Act's disclosure requirements are *not inconsistent* with the First Amendment. 424 U.S. at 82–83, 96 S.Ct. at 664–65. The Supreme Court considered the important privacy and association rights at stake for donors, acknowledged that "public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute," and held that the disclosure requirements were "the least restrictive means" of furthering the substantial government interests in informing the electorate on the sources of campaign money, deterring corruption, and detecting violations of the Act's contribution limitations. *Id.* at 67–68, 96 S.Ct. at 657–58. Indeed, because the "best efforts" provision—added to the Act after the Court decided *Buckley*—essentially offers an optional safe harbor or affirmative defense for political committees unable to secure the identifying information, it actually makes the Act's reporting requirements less stringent than the absolute disclosure requirements upheld in *Buckley.* As the district court explained, "the 'best efforts' regulation does not compel political committees to do anything, and there is no penalty for violation of the 'best efforts' regulation." *Republican Nat'l Comm.,* No. 94–1017, slip op. at 11. Because the absolute disclosure requirement at issue in *Buckley* does not violate the First Amendment, neither can an optional safe harbor for those unable to comply with the absolute disclosure requirement.

■ The Committees nevertheless argue that the restriction on additional speech is content-based and not narrowly tailored to the interests identified in *Buckley.* To determine whether the regulation is content-based (in which case we would apply strict scrutiny) or content-neutral (in which case we would apply intermediate scrutiny), we ask whether "the government has adopted a regulation of speech because of disagreement with the message it conveys," or whether "[The] regulation ... serves purposes unrelated to the content of expression." *Ward v.*

410

*Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661. (1989). Applying this standard, we conclude that the Commission's 1994 regulation is content-neutral. It forbids additional speech not because of any hostility to the content of that speech, but to "ensure that a written request for the information is not overlooked." 58 Fed.Reg. at 57,727.

■ Content-neutral regulations are valid if they are " 'narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.' " *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)). The Commission's regulation satisfies this standard. The administrative record identifies as one cause of low donor response rates the burying of requests for donor information among other material. Because the regulation prohibits that practice, we are satisfied that it promotes the very gathering of information that *Buckley* found to be in the public interest.

The regulation also leaves political committees free to express their views to donors in other communications. Even at the Committees' estimate of up to $6 per follow-up request, the cost is only about three percent of a $200 contribution, an amount not likely to inhibit political committees from "speaking." We agree with the district court that "such a minimal burden is not unconstitutional in light of *Buckley's* recognition of the strong governmental interest involved." *Republican Nat'l Comm.,* slip op. at 13. *Buckley* itself upheld the Act's reporting requirements, despite the Court's recognition that these requirements would financially burden campaigns by deterring some donors from contributing. *Buckley,* 424 U.S. at 68, 96 S.Ct. at 658.

Thus, prohibiting political committees from including additional information in their follow-up requests does not violate the First Amendment.

V.

■ Because the Commission's initial proposed regulation did not even include the requirement of a mandatory statement, *see* 57 Fed.Reg. 44,137, we have little doubt that the regulation is severable. *See North Carolina v. Federal Energy Regulatory Comm'n,* 730 F.2d 790, 795–96 (D.C.Cir.1984) (remand proper when "there is substantial doubt" as to whether the agency intended its regulation to be severable). Accordingly, as to the regulation's requirement of a standalone follow-up request, we affirm the district court's grant of summary judgment to the Commission. As to the mandatory statement, we reverse and remand with instructions to enter summary judgment for the Committees.

*So ordered.*

SENTELLE, Circuit Judge, concurring in part and dissenting in part:

Although I agree with most of the majority's analysis, I write separately because I reason somewhat differently, and more importantly, because I cannot agree with the majority's conclusion that the "stand alone" portion of the regulation can be severed and saved. First, I agree with the majority that the Commission's interpretation of the Act falls as unreasonable under *Chevron* analysis, but I would also strike the regulation as arbitrary under the Administrative Procedure Act.

1. *Chevron*

We apply the *Chevron* analysis where, as here, we are reviewing an interpretation of a statute by the agency that Congress has chosen to administer that statute. This is a two-step analysis, in which we first determine whether the statute is ambiguous in the sense that Congress has not clearly precluded the agency's interpretation, and then determine whether the agency's interpretation is reasonable. *See* 467 U.S. 837, 843–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). I agree with the majority that the Commission's interpretation in this case plainly surmounts the first step of *Chevron.* The statute does not unambiguously delineate what a political committee's "best efforts" entail.

The statute's bare reference to "best efforts" does not preclude the Commission from expecting a little more from political committees than it has in the past.

I further agree that the Commission's new rule stumbles on *Chevron*'s second step. The Commission argues that its rule merely establishes one possible means by which a political committee may demonstrate "best efforts," but the language of the new rule is clear and to the contrary. According to the rule, "the treasurer and the committee will *only* be deemed to have exercised best efforts" if the committee follows the procedure prescribed by the Commission. 11 C.F.R. § 104.7(b) (emphasis added). It is not reasonable for the Commission to declare that only strict adherence to its selected format will qualify as a political committee's best efforts. The phrase "best efforts" itself implies a range of actions should be acceptable. Nothing in the record suggests that the procedure endorsed by the Commission is the only manner in which a committee could make an effective request for information. In fact, testimony suggests that some political committees had adopted other reasonable approaches to obtain the information prior to the promulgation of the new rule. Based on this record, the Commission cannot decide that its chosen means by which a political committee obtains information categorically precludes compliance with the "best efforts" provision by any other efforts a political committee attempts.

The unreasonableness of the Commission's new rule may be easily illustrated. If a political committee sends seven follow-up letters, each proclaiming the prescribed statement in headline-sized type, but notes in small print in each that the law requires disclosure only from political committees, not political contributors, then that committee has not demonstrated best efforts under 11 C.F.R. § 104.7(b)(2). If a committee sends seventy times seven follow-up letters, but in each asks after the health of the contributor's family, it also has not shown best efforts under the new rule. In either case, the fault is not in the committee—which has done all that the statute could have conceivably envi-sioned—but in the unreasonableness of the rule promulgated by the Commission.

### 2. *Arbitrary and Capricious*

That the rule permits only the one narrow means of demonstrating "best efforts" becomes more unreasonable upon examination of the procedure mandated by the Commission. The Commission demands that all response material of a political committee intone that "[f]ederal law requires political committees" to disclose information about "each individual" donor to the FEC. The prescribed statement is clearly misleading in this context. Federal law does not require an individual to divulge his employer or his occupation, only that a political committee that receives such information must in turn disclose it to the FEC. Yet, a donor reading the required statement as it is currently worded is not likely to discern that distinction. *Cf. Bates v. State Bar of Arizona*, 433 U.S. 350, 383 & n. 37, 97 S.Ct. 2691, 2708 & n. 37, 53 L.Ed.2d 810 (1977) (noting that the legal sophistication of the audience is a key consideration in determining whether legal advertising is misleading). Even if the donor should notice that the statement by its terms only binds a political committee, the donor may still conclude that the statement intends to inform him that federal law compels a donor to divulge the information requested. Were it otherwise, a reasonable person would be right to wonder why this statement is even mentioned to the donor.

The required format of the follow-up request exacerbates the misleading nature of the prescribed warning. The Commission has very much limited the statements that may appear in the follow-up request because it fears that a political committee may hide its request for information amidst other visual clutter. Because of these limits on the request, however, a committee cannot include even a single clause to explain the warning in that follow-up. If a committee wishes to inform its contributors of the true extent of the law, it must send or otherwise convey an accompanying, but separate, explanation of the statement at its own additional expense in order to reassure the donor that it is not illegal to maintain his privacy.

The unreasonably misleading nature of the prescribed statement, coupled with the Commission's prohibition of additional explanation, provides sufficient grounds for us to hold the regulation arbitrary. Courts have suggested that an agency cannot mislead an individual. *See, e.g., Covington v. Dep't of Health & Human Serv.,* 750 F.2d 937, 942 (Fed.Cir.1984) (holding a retirement to be involuntary when the result of a misleading notice issued by an agency); *Shields Enterprises, Inc. v. United States,* 28 Fed.Cl. 615, 633 (1993) (indicating that if an agency's procurement procedure was misleading, it would be arbitrary). Likewise, the Commission cannot attempt to coerce through misleading statements of the law the individual disclosure that Congress chose not to require.

Not only is the prescribed statement misleading, but the Commission also did not sufficiently justify its choice of language for that statement in its decision. When an agency rejects other suitable alternatives without discussion, this court cannot reassure itself that the agency did not act arbitrarily by choosing an option that suffers a significant flaw. *See City of Brookings Mun. Tel. Co. v. FCC,* 822 F.2d 1153, 1169 (D.C.Cir.1987). Here, the Commission did not solicit or encourage comment on the specific language to be used in such a prescribed warning. In discussing the language actually selected, the Commission only compared one statement, which told the donor that a committee was required to disclose donor information to the FEC, with a single other statement, which said that a committee was required by law to ask the donors for information. *See* 58 Fed.Reg. at 57,727. The Commission then briefly explained its preference for the former based on the single factor that the former may have contributed to higher levels of disclosure. The Commission apparently never considered many other obvious—and more accurate—explanations of the law. For example, the Commission offered no justification for not prescribing a more complete statement of the Act, which would note that a political committee must only use its best efforts to obtain certain information from persons who contribute more than $200 and that it must then disclose any such information obtained to the FEC. Failure of an agency to discuss obvious alternatives "has led uniformly to reversal." *City of Brookings Mun. Tel. Co.,* 822 F.2d at 1169 (citations omitted). I would thus find the statement of the law prescribed by the Commission in 11 C.F.R. § 104.7(b) to be an abuse of its discretion. *See* 5 U.S.C. § 706(2)(A) (1994).

## CONCLUSION

I agree that the Commission may change its interpretation of "best efforts." It may not, however, unreasonably limit the possible avenues for a political committee to show "best efforts" to a single format. I also agree that it may not prescribe a misleading statement of the law as part of a required format without permitting a political committee some opportunity to explain that statement. Because the Commission's interpretation is not a reasonable one, I would reverse the judgment of the District Court. I do not follow the majority's reasoning that the requirement for a stand-alone mailing separate from the requirements of the contents of that mailing can be severed and saved. I would simply remand for the invalidation of the entire regulation.