# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 23, 2016        Decided August 2, 2016

No. 15-5264

PURSUING AMERICA'S GREATNESS,
APPELLANT

v.

FEDERAL ELECTION COMMISSION, OFFICE OF GENERAL
COUNSEL,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01217)

———

*Jason Torchinsky* argued the cause and filed the briefs for appellant.

*Christina M. Martin* was on the brief for *amicus curiae* Pacific Legal Foundation and James Madison Center for Free Speech in support of plaintiff-appellant.

*Charles Kitcher*, Attorney, Federal Election Commission, argued the cause for appellee. With him on the brief were *Daniel A. Petalas*, Acting General Counsel, *Kevin Deeley*, Acting Associate General Counsel, and *Erin Chlopak*, Acting Assistant General Counsel.

Before: GRIFFITH and KAVANAUGH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

GRIFFITH, *Circuit Judge*: The Federal Election Commission prohibits unauthorized political committees, like Pursuing America's Greatness, from using candidates' names in the titles of their websites and social media pages. Pursuing America's Greatness sought a preliminary injunction against this rule, which the district court denied. We reverse the district court because the restriction, as applied to Pursuing America's Greatness, is a content-based ban on speech that likely violates the First Amendment.

I

Pursuing America's Greatness (PAG) is a political committee that works for the election of federal officeholders. As a political committee, PAG must comply with the Federal Election Campaign Act (FECA), 52 U.S.C. §§ 30101-26, 30141-46, and the FEC's implementing regulations. This case deals with one set of those rules: naming restrictions for political committees.

FECA creates two baskets of naming restrictions, one for committees that are "authorized" by a candidate to receive or spend money on his behalf, and another for committees that are not so authorized. *Id.* § 30101(6) (defining "authorized committee"). An authorized committee *must* use the candidate's name in its name. *Id.* § 30102(e)(4). Unauthorized committees may not. *Id.* PAG is an unauthorized committee and cannot include any candidate's name in its own name. To illustrate the difference, consider two committees that supported the presidential bid of former Governor Mike Huckabee this election cycle. Huckabee's authorized committee is called "Huckabee for President." In contrast,

Huckabee's name appears nowhere in PAG's name, even though PAG also supported the former Governor's bid.

Although FECA's naming rules reach only committee names, the FEC also restricts the names of committee projects. 11 C.F.R. § 102.14(a) (extending FECA's naming requirements to "any name under which a committee conducts activities, such as solicitations or other communications, including a special project name"). According to the FEC, a committee's projects include online projects, such as websites or social media pages. *See* FEC Advisory Op. 2015-04, 2015 WL 4480266, at *2 (July 16, 2015); FEC Advisory Op. 1995-09, 1995 WL 247474, at *5 (Apr. 21, 1995). The naming restrictions apply whether or not a committee's project involves fundraising, because the FEC sees the "potential for confusion" as "equally great in all types of committee communications." FEC Advisory Op. 2015-04, 2015 WL 4480266, at *2 (quoting Special Fundraising Projects and Other Use of Candidate Names by Unauthorized Committees, 57 Fed. Reg. 31,424, 31,425 (July 15, 1992)).

But the FEC does not apply these rules to *all* committee projects. There is an exception that allows unauthorized committees to use candidate names in titles that "clearly and unambiguously" show opposition to the named candidate, 11 C.F.R. § 102.14(b)(3), because "the potential for fraud and abuse is significantly reduced." Special Fundraising Projects and Other Use of Candidate Names by Unauthorized Committees, 59 Fed. Reg. 17,267, 17,269 (Apr. 12, 1994). For instance, the FEC gave the example of a project titled "Citizens Fed Up with Doe." *Id.* There would be little risk that the public would think candidate Doe authorized the project's work.

Which brings us to the instant dispute. To support Governor Huckabee's most recent run for the White House, PAG used a website and a Facebook page named "I Like Mike Huckabee," which PAG worried would run afoul of the FEC's naming rules. PAG sought a preliminary injunction to prevent the FEC from enforcing those rules, invoking the First Amendment and the Administrative Procedure Act. The district court denied PAG's motion. *Pursuing America's Greatness v. FEC*, 132 F. Supp. 3d 23, 44 (D.D.C. 2015).

PAG timely appealed, and we have jurisdiction under 28 U.S.C. § 1292(a)(1). We reverse the district court, concluding that PAG is entitled to a preliminary injunction because there is a substantial likelihood that, as applied to PAG, the FEC's naming restrictions in section 102.14(a) violate the First Amendment.

II

At the outset, we must address two threshold issues. First, the FEC contends that PAG lacks a continuing interest in this case because Governor Huckabee has suspended his presidential campaign and PAG may now use his name in its online activities. Because our jurisdiction is limited to live cases or controversies, U.S. CONST. art. III, § 2, cl. 1, we cannot "retain jurisdiction over cases in which one or both of the parties plainly lack a continuing interest." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 192 (2000); *Calderon v. Moore*, 518 U.S. 149, 150 (1996) (per curiam) ("[A]n appeal should . . . be dismissed as moot when, by virtue of an intervening event, a court of appeals cannot grant 'any effectual relief whatever' in favor of the appellant." (citation omitted)).

We disagree with the FEC. Governor Huckabee is not the only candidate that PAG hopes to support this cycle. Rather, PAG intends to use the names of candidates still running for federal office in the titles of several other websites and Facebook pages. For example, PAG will use the title "I Like Kelly Ayotte" in its online support for Senator Kelly Ayotte and similar titles for Senator Richard Burr and Congressman David Young. Although the FEC argues that PAG has not financially supported Senator Ayotte, Senator Burr, or Congressman Young as it did Governor Huckabee, PAG's expenditures are irrelevant to PAG's interest in this case: its ability to operate websites and social media pages with titles forbidden by the FEC. PAG's intent to continue violating section 102.14(a) keeps this case alive. *Cf. Unity08 v. FEC*, 596 F.3d 861, 864 (D.C. Cir. 2010) (holding that controversy was not moot even though group stopped participating in 2008 election because group had a "clear and definite intent to resume its activities . . . for the 2012 presidential election").

We also conclude that PAG has standing to challenge section 102.14. To have standing, PAG must show, among other things, that its injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). PAG asks us to redress its injury by striking section 102.14's naming restrictions, which prevent PAG from using candidate names as it would like. The FEC recasts PAG's challenge, however, as contesting only a subset of section 102.14. The agency argues that enjoining the FEC from enforcing only that subset would not redress PAG's injury because the remaining portions of section 102.14 would still prevent PAG from using candidate names in its project titles. But the FEC is incorrect that PAG's challenge targets only a portion of section 102.14. Instead, PAG has clearly asked us to enjoin the FEC from enforcing the entirety of section 102.14 against it. Were we to grant PAG that relief,

its injury would undoubtedly be redressed. As a result, PAG has standing.

## III

To receive the "extraordinary remedy" of a preliminary injunction, PAG must make a "clear showing" that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008); *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009). We review the district court's weighing of these factors for abuse of discretion, but its legal conclusions de novo. *Davis*, 571 F.3d at 1291.

## A

PAG has shown a substantial likelihood of success on the merits of its First Amendment claim.[1]

---

[1] We need not resolve here any tension in the case law regarding the showing required on the merits for a preliminary injunction. *Compare Winter*, 555 U.S. at 20 (requiring the plaintiff to show "likely" success on the merits), *with Sottera, Inc. v. FDA*, 627 F.3d 891, 893 (D.C. Cir. 2010) (requiring the plaintiff to show "substantial likelihood" of success on the merits). PAG meets either standard. And, because PAG has shown a substantial likelihood of success on the merits, we need not decide whether showing a "likelihood of success" is "an independent, free-standing requirement, or whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a serious legal question on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (internal quotation marks omitted).

Before we reach PAG's First Amendment arguments, we first consider whether PAG's alternative APA claim has merit. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."). It does not.

PAG argues that the FEC violated the APA in extending section 102.14(a)'s naming rules to websites and social media pages that do not involve fundraising. Specifically, PAG challenges the FEC's 2015 advisory opinion, which announced that interpretation. *See* FEC Advisory Op. 2015-04, 2015 WL 4480266, at *2-3 (July 16, 2015). PAG grounds its challenge in the APA's prohibition on agency action that is arbitrary, capricious, an abuse of discretion, or contrary to law. 5 U.S.C. § 706(2)(A). PAG argues that in extending the reach of section 102.14 to websites and social media pages that lack any connection to fundraising, the FEC's advisory opinion strays beyond the underlying regulation's purpose. According to PAG, section 102.14 sought only to avoid fraud in fundraising, a risk not present here.

In issuing the advisory opinion, the FEC interpreted section 102.14, its own regulation. We give "substantial deference" to an agency's interpretation of its own regulation, *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994), and we will accept the agency's view unless it is "plainly erroneous or inconsistent with the regulation." *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013) (quoting *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 208 (2011)).

We conclude that the FEC reasonably applied the naming requirements of section 102.14 to an unauthorized

committee's websites and social media pages. The regulation applies to "any name under which a committee conducts activities, such as solicitations *or other communications*." 11 C.F.R. § 102.14(a) (emphasis added). This broad language can reasonably be read to encompass more than just fundraising activities. *See* FEC Advisory Op. 2015-04, 2015 WL 4480266, at *2 (concluding that this language "necessarily means that communications need not be solicitations" of donations to come within section 102.14(a)). In any event, the FEC justified extending the naming restrictions in section 102.14 to committee projects and other communications by more than just concern over fraud in fundraising, including the worry that voters might be confused whether a message is from a candidate or someone else. *See* 57 Fed. Reg. at 31,424-25. The FEC emphasized that "the potential for confusion is equally great in *all types* of committee communications," not only communications related to fundraising. *Id.* at 31,425 (emphasis added). Accordingly, we hold that PAG is unlikely to succeed on its APA challenge.[2]

ii

PAG's First Amendment argument fares much better. There is a substantial likelihood that section 102.14 violates the First Amendment as applied to PAG.

---

[2] PAG also argues that if we agree with the district court's conclusion that section 102.14 is a disclosure provision, we must find that it "cannot be applied to PAG's Facebook . . . communications" under relevant disclosure regulations. Appellant's Br. 55-56. We need not reach this argument because we conclude below that section 102.14 is not a disclosure requirement. *See infra* section III.A.ii.

The FEC and PAG principally disagree over how strictly we should review section 102.14. To PAG, the regulation is a classic restriction on political speech, and we should apply our highest presumption of illegality. *See Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (applying strict scrutiny); *see also* 57 Fed. Reg. at 31,425 (describing section 102.14(a) as a "ban" on speech). To the FEC, however, section 102.14 is not a restriction on speech at all. Instead, the FEC characterizes its rule as part of FECA's disclosure framework. The FEC urges that the rule gives effect to the Act's requirement that an unauthorized committee disclose that its communications are "not authorized by any candidate or candidate's committee." 52 U.S.C. § 30120(a)(3). We view disclosure rules far less skeptically than we do bans on speech. *See Citizens United*, 558 U.S. at 366-67.

To decide whether a law is a disclosure requirement or a ban on speech, we ask a simple question: does the law require the speaker to provide more information to the audience than he otherwise would? For example, disclosure rules have required speakers to identify those who fund their advertisements, *id.* at 366, the country of origin of the meat they sell, *Am. Meat Inst. v. USDA*, 760 F.3d 18, 20 (D.C. Cir. 2014) (en banc), or the total price of their airline tickets, *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 687 F.3d 403, 413-14 (D.C. Cir. 2012). *See also Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 524 (D.C. Cir. 2015). The Supreme Court's decision in *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985), which dealt with the regulation of commercial speech, is instructive. There, a state disciplinary rule required attorneys who advertise contingency-fee services to include a notice that a client might have to pay some costs if the claim failed. *Id.* at 633. The challenger argued that the requirement was a ban on commercial speech, and not a disclosure. *Id.* at 650. The

Supreme Court thought otherwise. The challenger's argument "overlook[ed] material differences between disclosure requirements and outright prohibitions on speech." *Id.* The law was a disclosure, not a speech ban, in part because it did not "prevent attorneys from conveying information to the public." *Id.* Instead, it "only required [attorneys] to provide somewhat more information than they might otherwise be inclined to present." *Id.*[3]

Following *Zauderer*'s logic, we do not think that section 102.14(a) compels disclosure. It does not require PAG "to provide somewhat more information" than it otherwise would. *Id.* It does not obligate PAG to say anything. Quite the opposite. The regulation "prevent[s]" PAG "from conveying information to the public." *Id.*; *see also Citizens United*, 558 U.S. at 366 ("[D]isclosure requirements . . . 'do not prevent anyone from speaking.'" (quoting *McConnell v. FEC*, 540 U.S. 93, 201 (2003))).

To be sure, disclosure rules often do incidentally prohibit speech, because the requirement to say one thing necessarily means the speaker cannot say the opposite. FECA provides a ready illustration. FECA requires an unauthorized committee to explain to the public that its "communication is not authorized by any candidate or candidate's committee." 52 U.S.C. § 30120(a)(3); *see also id.* § 30120(d)(2) (requiring radio or television communications to state who "is responsible for the content of th[e] advertising"). That is a

---

[3] *Zauderer* also noted that "in some instances compulsion to speak may be as violative of the First Amendment as prohibitions on speech." 471 U.S. at 650. We do not opine here on when the compulsion to speak becomes more like a speech restriction than a disclosure. Instead we make the more limited point that the provision of information is necessary, but not sufficient, for a law to be a disclosure.

garden-variety disclosure requirement: unauthorized committees must provide more information than they otherwise would. Yet the required disclosure also necessarily prohibits an unauthorized committee from saying that its communication *is* authorized by the candidate. For example, when PAG announces that it is not authorized to act on a candidate's behalf, it cannot turn around and say that it is authorized as well. If it did, PAG would not be disclosing the information mandated by the statute.

But PAG has provided all the information that the FEC and FECA require. PAG's websites and social media pages tell the audience that PAG is not authorized to act on any candidate's behalf, and the FEC does not argue that PAG says the opposite or otherwise violates FECA's disclosure requirements. All PAG hopes to do is use candidate names in the titles of its communications. Even if using a candidate's name in that way might make FECA's disclosure provisions less effective, that possibility alone neither violates FECA nor transforms a speech restriction into a disclosure. By prohibiting the use of a candidate's name in the titles of PAG's websites and social media pages, the FEC banned more speech than that covered by FECA's provisions requiring disclosure. *See Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 426-27 (5th Cir. 2014) ("[P]rovisions that put a ceiling on speech even if a party is willing to provide all of the information that the government requests constitute[] something more than a simple disclosure requirement."). As a result, we conclude that section 102.14(a) is a restriction on PAG's political speech, not a disclosure requirement.[4]

---

[4] Nothing in *Common Cause v. FEC*, 842 F.2d 436 (D.C. Cir. 1988), or *Galliano v. U.S. Postal Service*, 836 F.2d 1362 (D.C. Cir. 1988), both cited by the FEC, undermines our conclusion. Although

The First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011) (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)). Among restrictions on political speech, particularly troublesome are those that are based on the content of the speech. A law prohibiting speech that "draws distinctions based on the message a speaker conveys" must serve a compelling interest and be narrowly tailored to advance that interest. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) (applying strict scrutiny); *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (explaining that a law is content based if it "require[s] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred" (internal quotation marks omitted)).

On its face, section 102.14 "draws distinctions" based solely on what PAG says. *Reed*, 135 S. Ct. at 2227. As an unauthorized committee, PAG can use a candidate's name in a title of a communication only if the title demonstrates opposition to the candidate.[5] In other words, to know whether

those cases characterized FECA's naming restrictions (then codified at 2 U.S.C. § 432(e)(4)) as part of a disclosure regime, they did not assess the constitutionality of section 102.14. *See Galliano*, 836 F.2d at 1363-64, 1368; *Common Cause*, 842 F.2d at 439, 442.

[5] Before the district court, PAG characterized its argument as an as-applied challenge. That does not prevent us from looking at the face of section 102.14 in determining whether it is content based. "[T]he distinction between facial and as-applied challenges is not so well defined . . . that it must always control the . . . disposition in every case." *Citizens United*, 558 U.S. at 331. Indeed, "[t]he substantive rule of law is the same" for both as-applied and facial First Amendment challenges. *Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014); *see Legal Aid Servs. of Or. v.*

to apply section 102.14, the FEC must "examine the content" of the title of PAG's website or Facebook page and ask whether the title supports or opposes the candidate. *McCullen*, 134 S. Ct. at 2531. That is content-based discrimination pure and simple.

Citing our decision in *Republican National Committee v. Federal Election Commission*, 76 F.3d 400 (D.C. Cir. 1996), the FEC argues that section 102.14 is not content based because it has a benign purpose: avoiding voter confusion. In *Republican National Committee*, political committees challenged an FEC regulation that required them to send letters to their donors providing no more than certain limited pieces of information. *Id.* at 403, 409. The political committees argued that the rule violated the First Amendment because they were not allowed to include additional speech in the letter beyond that prescribed by the FEC. Relying upon the Supreme Court's decision in *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), we upheld the rule on the ground that it served "purposes unrelated to the content of expression." *Republican Nat'l Comm.*, 76 F.3d at 409 (quoting *Ward*, 491 U.S. at 791). Because the FEC rule could be justified without reference to the content of speech, we concluded that the rule was not content based, and that it passed muster under intermediate scrutiny. *Id.* at 409-10.

But since our decision in *Republican National Committee*, the Supreme Court has articulated a more limited view of the role purpose should play in our analysis. In *Reed*, the Court instructed that we should look to purpose only if the text of the law is not content based. 135 S. Ct. at 2228-29. If a

---

*Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010) ("The underlying constitutional standard, however, is no different [in an as-applied challenge] th[a]n in a facial challenge."). Here, the substantive law requires us to look at what the regulation says.

law, by its terms, discriminates based on content, we apply strict scrutiny "regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 2228 (citation omitted). According to *Reed*, *Ward* "had nothing to say about facially content-based restrictions." *Id.* To the extent our decision in *Republican National Committee* looked to the purpose of a law that regulated content on its face, *Reed* forbids us from following *Republican National Committee*'s course here. Because the plain terms of section 102.14 prohibit speech based on the message conveyed, the regulation is content based regardless of its purpose.

Nor does section 102.14's limited scope change our conclusion. The FEC argues that section 102.14 is not content based because PAG can still discuss candidate names anywhere else within a project, except its title. But whether a burden on speech leaves open alternative means of expression does not factor into whether a speech ban is content based. *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 812 (2000) (concluding that, when evaluating whether a law is a content-based speech restriction, it is "of no moment that the statute does not impose a complete prohibition"). Rather, the availability of alternative avenues of expression is often relevant to a wholly separate question: once we determine that a law is *not* content based, we look to its scope to decide whether the law nevertheless overly burdens speech. *See United States v. Grace*, 461 U.S. 171, 177 (1983) (explaining that the government may regulate the time, place, or manner of protected speech where the law is "content-neutral," "narrowly tailored," "and leave[s] open ample alternative channels of communication"). At any rate, the FEC understates the importance of a title. The title is a critical way for committees to attract support and spread their message because it tells users that the website or Facebook page is

about the candidate. Without a candidate's name, the title does not provide the same signaling to the audience. Allowing a committee to talk about a candidate in the body of a website is of no use if no one reaches the website. *Cf. McCullen*, 134 S. Ct. at 2536-37.

Because section 102.14(a) restricts political speech based on its content, the FEC may enforce the regulation only if it passes strict scrutiny. Accordingly, the government must show the restriction is narrowly tailored to a compelling governmental interest. *Reed*, 135 S. Ct. at 2231; *see Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("[T]he burdens at the preliminary injunction stage track the burdens at trial."). If a less restrictive alternative for achieving that interest exists, the government "must use that alternative." *Playboy Entm't*, 529 U.S. at 813. The government fails to meet its burden.

We assume that the government has a compelling interest in avoiding the type of voter confusion identified by the FEC. *See Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion). Here, the FEC reasonably fears that voters might mistakenly believe an unauthorized committee's activities are actually approved by a candidate if the committee uses the candidate's name in its title. But there is a substantial likelihood that section 102.14 is not the least restrictive means to achieve the government's interest.

For example, as amicus pointed out, the FEC could require a large disclaimer at the top of the websites and social media pages of unauthorized committees that declares, "This Website Is Not Candidate Doe's Official Website." The Supreme Court regularly views such disclosure requirements as less restrictive alternatives to "flat bans" on speech. *McCutcheon v. FEC*, 134 S. Ct. 1434, 1460 (2014) (plurality

opinion); *see also Citizens United*, 558 U.S. at 369. But the FEC rejected proposals to have "stronger, or larger, disclaimers, in place of the overall ban." 59 Fed. Reg. at 17,268. Its only reason for doing so was that it "believe[d] that such an approach could be more burdensome than the current ban, while still not solving the potential for fraud and abuse in this area." *Id.* The FEC offered no evidence that larger or differently worded disclosures would be less effective at curing fraud or abuse than a ban on speech. Nor did the FEC make an effort to explain why such disclosures would be more burdensome. Without more reasoning, it is "difficult to assess" the merits of the FEC's conclusions. *United States v. Alvarez*, 132 S. Ct. 2537, 2551 (2012) (plurality opinion). What is clear, however, is that the FEC "must present more than anecdote and supposition" to support a regulation subject to strict scrutiny. *Playboy Entm't*, 529 U.S. at 822; *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden[.]"). Where the "record is silent as to the comparative effectiveness of . . . two alternatives"—one of which burdens more speech than the other—the more burdensome restriction cannot survive strict scrutiny. *Playboy Entm't*, 529 U.S. at 826.

Because the FEC has not shown that its speech ban is the least restrictive means of achieving the government's interest, there is a substantial likelihood that section 102.14 fails strict scrutiny and violates the First Amendment as applied to PAG.

B

In First Amendment cases, the likelihood of success "will often be the determinative factor" in the preliminary injunction analysis. *Joelner v. Vill. of Wash. Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004). And so it was in the district

court here. Having concluded that PAG's merits challenges were unlikely to succeed, the district court found nothing to support a preliminary injunction among the remaining factors. Because we see likely success in PAG's constitutional challenge, we view more favorably PAG's arguments regarding irreparable injury, the balance of the equities, and the public interest.

PAG has demonstrated that it will likely suffer irreparable injury if we do not provide preliminary relief. Without such relief, PAG cannot include candidate names in its website or social media page titles during this election cycle. The loss of First Amendment "freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

The remaining two factors also favor PAG. The balance of the equities weighs the harm to PAG if there is no injunction against the harm to the FEC if there is. *See Winter*, 555 U.S. at 25-26. And in this case, the FEC's harm and the public interest are one and the same, because the government's interest *is* the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that, in the context of a stay, assessing the harm to the opposing party and weighing the public interest "merge when the Government is the opposing party"). The FEC contends that a preliminary injunction will undermine the interest that both the government and the public have in limiting fraud, abuse, and confusion. But there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation and, without a preliminary injunction, PAG is unable to exercise those rights during this election cycle. *See Gordon v. Holder*, 721 F.3d 638, 653

(D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest."). In addition, FECA and its accompanying regulations do much to limit voter confusion over the source of a message. Communications from committees must disclose whether they are authorized or unauthorized and who paid for the communication, even in their websites. *See* 11 C.F.R. § 110.11. Those disclosures must also be "clear and conspicuous" to give readers "adequate notice." *Id.* § 110.11(c)(1). The FEC's website also contains a publicly searchable list of all political committees and their status as authorized or not.[6] Given these tools to avoid voter confusion, the public's interest in protecting First Amendment rights and PAG's ability to exercise those rights outweigh any interest in the continued enforcement of section 102.14.

IV

We reverse the district court's denial of PAG's motion for a preliminary injunction and remand for the district court to enter a preliminary injunction enjoining the application of 11 C.F.R. § 102.14(a) against PAG's websites and social media pages.

---

[6] Federal Election Commission, *New Committee Registrations*, http://www.fec.gov/data/Form1Filer.do?format=html (last visited July 15, 2016).