**SOUTHERN CALIFORNIA EDISON COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**United States Department of the Interior and United States Department of Agriculture, Intervenors.**

Nos. 95–1171, 95–1206.

United States Court of Appeals, District of Columbia Circuit.

Argued March 17, 1997.

Decided June 17, 1997.

Nino J. Mascolo, Rosemead, CA, argued the cause for petitioner Southern California Edison Company, and Stuart K. Gardiner, San Francisco, CA, argued the cause for petitioner Pacific Gas and Electric Company. With them on the joint briefs were Carol B.

Henningson and John S. Tinker, Rosemead, CA, for petitioner Southern California Edison Company, and Lindsey How–Downing, San Francisco, CA, for petitioner Pacific Gas and Electric Company.

Samuel Soopper, Attorney, Federal Energy Regulatory Commission, Mount Rainier, MD, argued the cause for respondent. With him on the brief was Jerome M. Feit, Solicitor, Washington, DC, at the time the brief was filed.

Joan M. Pepin, Attorney, U.S. Department of Justice, Washington, DC, argued the cause for intervenors in support of respondent. With her on the brief were Lois J. Schiffer, Assistant Attorney General, and John A. Bryson, Attorney. Anne S. Almy, Attorney, entered an appearance.

William J. Madden, Jr. and John A. Whittaker IV, Washington, DC, were on the brief for amici curiae Edison Electric Institute, et al., in support of petitioners. Henri D. Bartholomot entered an appearance for amicus curiae Edison Electric Institute. Wallace F. Tillman, Arlington, VA, entered an appearance for amicus curiae National Rural Electric Cooperative Association. Alan H. Richardson entered an appearance for amicus curiae American Public Power Association. Donald H. Clarke, Washington, DC, entered an appearance for amicus curiae National Hydropower Association. Stuart L. Somac, Sacramento, CA, entered an appearance for amicus curiae Arnold Beckman.

Before RANDOLPH, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

The Federal Power Act authorizes the Federal Energy Regulatory Commission to issue two sorts of licenses for hydropower projects: "original licenses," for projects that have yet to be built, and "new licenses," for existing projects whose original licenses have expired. Section 4(e) of the Power Act requires the Commission to include in original licenses for projects on various types of federal reservations, including national forests, conditions recommended by the federal agency responsible for administering the land. In this case we answer two questions about the types of conditions FERC must include in new licenses for projects located on federal reservations. The first question asks whether mandatory section 4(e) conditions apply to new licenses as well as to original ones. Finding Congress's intent on this point unclear and the Commission's interpretation of the Act reasonable, we defer to the Commission and hold that the mandatory conditioning requirement of section 4(e) applies to new licenses. The second question asks whether section 4(e) confines land-administering agencies to relying on a reservation's original purposes—typically timber production and watershed protection—in defining their section 4(e) conditions, or whether it allows them to look to the broader group of purposes for which the reservation is managed today—including environmental, wildlife, and recreational concerns. Finding section 4(e) unambiguous on this point, we hold that agencies' section 4(e) conditions may relate to the broader group of purposes. Finally, we find that the particular conditions attached to petitioners' licenses are reasonable, supported by substantial evidence, and not otherwise inconsistent with the Power Act.

I

The Federal Power Act, 16 U.S.C. § 791a *et seq.* (1994), governs the development of the Nation's hydroelectric power resources. Section 4(e) authorizes the Federal Energy Regulatory Commission to "issue licenses ... for the purpose of constructing, operating and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the ... development, transmission, and utilization of power" on bodies of water within Congress's Commerce Clause jurisdiction or

> upon any part of the public lands and reservations of the United States ...: *Provided,* That licenses shall be issued within any reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the pur-

pose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservations.

16 U.S.C. § 797(e). The Act defines "reservations" as "national forests, tribal lands embraced within Indian reservations, military reservations, and other lands and interests in lands owned by the United States, and withdrawn, reserved, or withheld from private appropriation under the public land laws" as well as "lands and interests in lands acquired and held for any public purposes," but not national monuments or national parks. *Id.* § 796(2).

The Act establishes a maximum license term of fifty years, *id.* § 799, reserving the federal government's right to take over projects when their licenses expire, *id.* § 807(a). Under section 15, if the government chooses not to exercise its right to take over a project, the Commission may "issue a new license to the existing licensee upon such terms and conditions as may be authorized or required under the then existing laws and regulations, or . . . issue a new license under said terms and conditions to a new licensee." *Id.* § 808(a)(1).

In 1940, petitioner Southern California Edison was awarded an original fifty-year license for its Bishop Creek Project, located in eastern central California. *Southern Cal. Edison Co.,* 68 F.E.R.C. ¶ 62,058, 64,082 (1994), *reh'g denied,* 70 F.E.R.C. ¶ 61,130 (1995). Most of the project's lands lie within the Inyo National Forest. *See Keating v. FERC,* 114 F.3d 1265, 1268 (D.C.Cir.1997). A much smaller portion of the project sits on lands administered by the Bureau of Land Management. The project works consist of thirteen dams, five powerhouses, and related facilities. The project has a capacity of 26.2 megawatts. *Id.* at 64,064.

With the expiration date for its original license approaching, Edison applied for a new license in 1986. Pursuant to section 4(e) of the Power Act, the Forest Service and the Bureau of Land Management each recommended inclusion of several conditions in the license. In 1994, FERC granted the new license to Edison with the recommended conditions included, *id.* at 64,071–64,076, though it later deleted two conditions that it found violated the Energy Policy Act of 1992. *Southern Cal. Edison,* 70 F.E.R.C. at 61,-354–61,355 (denying rehearing). Of the remaining conditions, twelve came from the Forest Service: articles 102 and 103 of the license require the company to get approval from the Forest Service before building or relocating project facilities; article 104 obligates Edison to consult annually with the Forest Service about plans for protecting natural resources; article 105 establishes minimum water flows to protect fish populations in Bishop Creek; article 106 requires the company to install particular types of gages to measure the flows; article 107 requires the company to pay for constructing a number of access trails and for operating and maintaining recreation facilities connected to the lakes created by the project's reservoirs; articles 108–110 obligate Edison to carry out Forest Service plans concerning soil erosion and waste and hazardous substance disposal; articles 111 and 112 require the company to file plans for the disposal of construction material and for the design of certain project facilities; and article 113 requires Edison to undertake certain measures to protect sensitive plants and wildlife. The Bureau of Land Management's conditions incorporate the Forest Service conditions, impose a separate minimum-flow requirement for the portion of the project on Bureau land, and require Edison to obtain Bureau authorization before removing minerals from Bureau land. *Southern Cal. Edison,* 68 F.E.R.C. at 64,076.

Petitioner Pacific Gas & Electric was the original licensee for the Tule River Project, located in Tulare County, California. Most of the project's lands lie within the Sequoia National Forest. Consisting of three dams, a powerhouse, and related facilities, the project has a capacity of 7.9 megawatts. *Pacific Gas & Elec. Co.,* 65 F.E.R.C. ¶ 62,265, 64,633 (1993), *reh'g denied,* 70 F.E.R.C. ¶ 61,185 (1995). Like Edison, PG&E applied for a new license in 1986. Including six Forest Service section 4(e) conditions, FERC granted the license in 1993, *id.* at 64,637, 64,639–

64,642, later deleting one condition it found inconsistent with the Energy Policy Act of 1992. *Pacific Gas & Elec.*, 70 F.E.R.C. at 61,613. The five remaining conditions were as follows: articles 102–104 impose the Forest Service's "standard" requirements for annual consultation and for written approval for construction or relocation of project works; article 105 establishes a minimum-flow regime; and article 106 requires the company to pick up the tab for certain project-related recreation facilities. *Pacific Gas & Elec.*, 65 F.E.R.C. at 64,640–64,642.

## II

■■■ Petitioners begin their challenge to the section 4(e) conditions in their licenses by arguing that the Commission's authority to require section 4(e) conditions extends to original licenses only. Because this issue turns on the meaning of the Power Act, a statute the Commission is charged with administering, we review the agency's approach under the familiar standards of *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See also, e.g., Oconto Falls v. FERC*, 41 F.3d 671, 674 (D.C.Cir. 1994). "If the intent of Congress is clear, that is the end of the matter," and we must give effect to "that unambiguously expressed intent." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781. If "Congress has not directly addressed the precise question at issue," however, we defer to the Commission's construction as long as it is "permissible," *id.* at 843, 104 S.Ct. at 2782, that is, reasonable in light of the Act's text, legislative history, and purpose. *See, e.g., Republican Nat'l Comm. v. FEC*, 76 F.3d 400, 406 (D.C.Cir.1996).

We start with the words of sections 4(e) and 15. As the Commission acknowledges, the language of these sections suggests that "[s]ection 4(e) generally applies to original licenses ... and [that] [s]ection 15 provides the general procedures for relicensing." Resp. Br. at 18. Not clear from the statute's language, however, is whether section 4(e)'s mandatory conditioning proviso applies to original licenses only, or whether it applies to new licenses as well.

According to petitioners, several phrases in section 4(e) demonstrate that Congress intended to restrict that section to original licensings. They note, for example, that licenses are issued for the purposes of "*constructing,* operating, *and* maintaining" hydropower facilities and that the section's second proviso requires Army Corp of Engineers approval for certain "*contemplated* improvement[s]." *Id.* § 797(e) (emphasis added). They take these word choices to imply that section 4(e) applies only to projects that have yet to be built, not to existing projects.

Although these words certainly suggest that section 4(e) applies to original licensings, we see nothing in them implying that the section may not apply, as FERC argues, to relicensings as well. Indeed, several other phrases in section 4 suggest that Congress intended it to apply to all licenses issued under the Act. For example, it describes several of the Commission's general powers—powers that could apply in relicensings as well as original licensing proceedings. Beginning, "The Commission is authorized and empowered," section 4 lists seven activities the Commission may undertake, including investigating water resources, cooperating with state governments, and publicizing the results of its research. 16 U.S.C. § 797. The fifth activity, addressed in section 4(e), is issuing licenses. As the Commission points out, section 4(e) refers simply to "licenses," not "original licenses." Moreover, that section lists the general qualifications for all hydropower licensees, original or new. They must be "citizens of the United States, or ... any association of such citizens, or ... any corporation ... or ... any State or municipality." *Id.* § 797(e). Section 4(e) also describes the general purposes of all licenses granted under the Power Act: "the development and improvement of navigation and ... the development, transmission, and utilization of power ...." *Id.*

In another effort to find clarity in the language of sections 4 and 15, petitioners observe that section 4(e) authorizes the Commission to license "project works," whereas section 15 authorizes the Commission to license "projects." Pointing out that the Act distinguishes the meanings of these terms

quite precisely, petitioners contend that this reflects the different types of licenses to which the two sections apply. Projects are "complete unit[s] of improvement or development," including "water-rights, ... lands, or interest in lands the use and occupancy of which are necessary or appropriate in the maintenance and operation of such unit." *Id.* § 796(11). Project works are only the "physical structures of a project." *Id.* § 796(12). *Cf. Montana Power Co. v. FPC,* 298 F.2d 335, 339 (D.C.Cir.1962); *Lake Ontario Land Dev. & Beach Protection Ass'n, Inc. v. FPC,* 212 F.2d 227, 232 (D.C.Cir.1954). Section 4(e)'s reference to "project works," according to petitioners, shows that the section concerns the creation of projects, and thus initial licensings, whereas section 15's reference to "projects" assumes the existence of the projects being licensed, thus confining that section to relicensings.

Although these terms confirm our understanding of the general relationship between sections 4(e) and 15—the former addressing at least original licensings and the latter addressing relicensings—we think they fall short of demonstrating that section 4(e)'s mandatory conditioning proviso does not apply to relicensings. Indeed, section 15 authorizes the Commission to issue new licenses "upon such terms and conditions as may be authorized or required under the then existing laws and regulations." 16 U.S.C. § 808(a)(1). While this clause does not specifically mention section 4(e), we think it reasonable to read it, as FERC does, to encompass that section. We note as well that a 1986 amendment to the Power Act, discussed in greater detail below, *see infra* at 14–15, seems to ignore the distinction between projects and project works, making us even more hesitant to place too much stress on this distinction.

Looking beyond the text of sections 4(e) and 15, petitioners argue that the structure of the Act as a whole and the relationship between these sections and other parts of the statute demonstrate that Congress did not intend section 4(e)'s mandatory conditioning requirement to apply to new licenses under section 15. They note, for example, that section 15 authorizes the Commission to is-

sue "new licenses" and that it appears quite late in the Act, referring back to section 14, which preserves the federal government's right to take over projects when their original licenses expire. Petitioners also point out that sections 9(b) and 10(d) refer to relicensings under section 15. *See Id.* §§ 802(b), 803(d). Again, although these bits of textual evidence suggest that section 15 applies to relicensings—a proposition the Commission readily acknowledges—they demonstrate nothing about whether that section incorporates the mandatory conditioning requirement of section 4(e).

Petitioners argue that incorporating section 4(e) conditions into section 15 would conflict with or duplicate Commission licensing authority preserved in other parts of the Act. According to petitioners, not only do sections 10(a) and 10(j) already give the Commission authority to consider the interests protected by land-administering agencies through their section 4(e) conditioning authority, *see id.* § 803(a), (j), but including section 4(e) conditions in new licenses would also undermine the Commission's authority under section 24 of the Act to protect project lands for hydropower development, *see id.* § 818.

We think petitioners' arguments prove too much; the internal conflicts and irrational redundancies they perceive in the Act taint original as much as new licensings. They thus tell us nothing about what Congress intended regarding section 4(e) conditioning in relicensings. Moreover, in a case concerning original licensings, *Escondido Mutual Water Co. v. La Jolla Band of Mission Indians,* 466 U.S. 765, 104 S.Ct. 2105, 80 L.Ed.2d 753 (1984), the Supreme Court considered and rejected a similar argument regarding the supposed tension between sections 10(a) and 4(e). Noting that section 10(a) gives the Commission ultimate authority and responsibility to ensure that projects will be "best adapted" to serve a number of interests, 16 U.S.C. § 803(a), the Court found no conflict between this authority and the land-administering departments' power to impose conditions under section 4(e). *Escondido,* 466 U.S. at 778 n. 21, 104 S.Ct. at 2113 n. 21. Although section 10(a) has been amended

and section 10(j) added since the Court decided *Escondido*, we think the Court's conclusion still applies. Ensuring that FERC consults with state and other federal agencies to take account of nonpower concerns, these amendments apply to all hydropower projects licensed under the Act, whereas section 4(e) addresses only the much smaller group of projects located on federal reservations. Thus, to the extent that these sections, combined with section 4(e), create a measure of institutional redundancy for the protection of non-hydropower interests, that redundancy, an understandable byproduct of Congress's protection of such interests through the Act's general provisions concerning all hydropower licenses, applies only to projects on federal reservations. Certainly nothing about these amendments suggests that Congress intended to eliminate the potential redundancy approved by the Supreme Court in *Escondido*.

Nor, finally, would including section 4(e) conditions in new licenses conflict with section 24 of the Power Act. Section 24 simply assures that once a party applies for a hydropower license for a project on federal land, the government will preserve the land from alternative private uses until the Commission acts on the application or Congress intervenes. *See* 16 U.S.C. § 818. Section 24 imposes no restrictions on either the Commission's or the land-administering departments' authority to include conditions in the license if the Commission issues one.

Turning from text and structure to legislative history, petitioners argue that Congressional debate on the Federal Water Power Act, Pub.L. No. 66–280, 41 Stat. 1063 (1920), the source of sections 4(e) and 15, proves Congress intended mandatory conditioning to apply to original licenses only. Pointing out that one of that Act's central goals was promotion of private investment in hydropower development, petitioners maintain that including in new licenses section 4(e) conditions unconnected to a project's economic viability might deprive licensees of the ability to continue operating projects profitably.

Although petitioners are correct that the Water Power Act's legislative history reflects Congress's concern with promoting private

hydropower investment, the Act accomplishes that goal primarily through its guarantee of fixed license terms, *see Pacific Gas & Elec. Co. v. FERC,* 720 F.2d 78, 83 (D.C.Cir.1983); *see also Chemehuevi Tribe v. FPC,* 420 U.S. 395, 407, 95 S.Ct. 1066, 1074, 43 L.Ed.2d 279 (1975), and stable license conditions, *see Pacific Gas & Elec.,* 720 F.2d at 83–84 & nn.12–13. The legislative history also reflects considerable interest in the issue of protecting existing investments at the point of relicensing, but never clearly links this concern to the question of section 4(e) conditions. Equally important, the legislative history reflects a countervailing concern, ignored by petitioners, about excessively generous public subsidization of hydropower developers. *See, e.g., Water Power: Hearings before the Committee on Water Power,* 65th Cong. 28–30 (1918) (statements of Rep. Ferris).

Petitioners emphasize the phrase "upon reasonable terms," which was added to the proviso at the end of section 15 during Senate consideration of the Water Power Act. *See* S.REP. NO. 66–180, at 16 (1919); *see also* H.R.REP. NO. 66–61, at 1–5 (1919); S.REP. NO. 66–180, at 1–3; 59 CONG. REC. 6330 (1920) (Senate receipt of conference report); *id.* at 7778–79 (Senate vote on final passage). As enacted, the proviso states:

> That in the event the United States does not exercise the right to take over or does not issue a license to a new licensee, or issue a new license to the original licensee, *upon reasonable terms,* then the commission shall issue from year to year an annual license to the then licensee under the terms and conditions of the original license until the property is taken over or a new license is issued as aforesaid.

Pub.L. No. 66–280, § 15, 41 Stat. 1063, 1072 (1920) (emphasis added). Petitioners argue that this modification and comments by the Senate Commerce Committee and one of the amendment's sponsors explaining the modification show that Congress did not want section 4(e) conditions to be imposed at relicensing. The Commerce Committee report on which petitioners rely states:

> It is the opinion of practically all those acquainted with investments of this kind

that this language is necessary to insure the investment of capital in these great and much needed enterprises. The interests of the Government and the public are not impaired. The works must be continued in operation at the end of 50 years in order that the industries created by them and dependent upon them may not suffer. Private capital should not be required to do this upon unreasonable terms nor should its property be confiscated.

S.REP. No. 66–180 at 2; *see also* 59 CONG. REC. 1049 (Jan. 5, 1920) (statement of Sen. Myers).

We doubt this small bit of legislative history can bear the interpretive weight petitioners place on it. To begin with, the phrase concerning reasonable terms appears in a proviso primarily concerned with assuring the issuance of annual licenses during the relicensing process. The body of section 15 directs the Commission to issue new licenses "upon such terms and conditions as may be authorized or required under the then existing laws and regulations," a phrase surely contemplating both a broad and evolving conditioning authority. Moreover, because section 4(e) conditions must themselves be reasonable, *Escondido*, 466 U.S. at 778, 104 S.Ct. at 2113, the requirement of reasonable conditions presents no conflict with section 4(e).

Finally, the history of the "upon reasonable terms" phrase shows that it cannot provide petitioners with the protection they seek. Commenting on an earlier version of the bill that became the Act, the Secretaries of War, Interior, and Agriculture had recommended including in section 15's proviso the specific requirement that conditions in new licenses not "impair [licensees'] net investment." H.R.REP. No. 65–715, at 36 (1918). Had this phrase survived into the Power Act, perhaps petitioners' argument might have some force. But it did not. Initially rejecting inclusion of an annual-licensing proviso altogether, *see id.* at 9, the House ultimately included a proviso without any qualifying language, *see* S. REP. 66–180, at 16. The Senate, selecting a weaker, looser standard than the more specific language about protecting net investment initially sought by the administra-tion, added "upon reasonable terms" to the final version of the Act. While the phrase's inclusion may thus indicate something about Congress's effort to protect private hydropower investment, it tells us at least as much about Congress's desire to preserve the regulatory power of the agencies whose mission is to oversee the development of hydropower.

Petitioners seek support for their reading of the Power Act from the text and legislative history of several of the Act's amendments. Because the Supreme Court has repeatedly warned that subsequent Congressional views are a treacherous basis for divining Congress's intent at an earlier point in time, we approach these contentions with particular caution. *See, e.g., Chapman v. United States*, 500 U.S. 453, 464 n. 4, 111 S.Ct. 1919, 1927 n. 4, 114 L.Ed.2d 524 (1991).

Beginning with the 1968 amendments to the Power Act, which expedited decisions about federal takeovers of hydropower projects at the expiration of original licenses and authorized the Commission to issue new licenses for nonpower uses of existing project works, *see* Pub.L. No. 90–451, 82 Stat. 616 (1968); H.R.REP. No. 90–1643 (1968), *reprinted in* 1968 U.S.C.C.A.N. 3081, petitioners draw our attention to the following passage in the House Report accompanying the amendment: "The existing provisions of the Federal Power Act assign the Commission the same powers to condition new licenses under section 15 as it has to condition original licenses under section 4." H.R.REP. No. 90–1643, at 8, *reprinted in* 1968 U.S.C.A.A.N. 3088. From this statement, petitioners conclude that "relicensing neither relies on nor applies section 4(e)." Pet'rs' Br. at 15. But because the passage says that the Commission's conditioning authority at relicensing is the same as its conditioning authority in original licensings, we could just as easily read it to stand for the proposition that section 15 incorporates section 4(e)'s mandatory conditioning proviso. Indeed, a letter from the Secretary of Agriculture to the chairman of the House committee that considered the amendment, reprinted in the House Report, suggests that the Secretary of Agriculture viewed the matter just this way. Addressing

the Commission's new authority to issue non-power licenses, the Secretary wrote:

> [I]f this Department can and will be responsible for and administer the lands and facilities which would be included in the nonpower licenses, the license for such use will be issued only with the consent of this Department and subject to such conditions as we deem necessary for the adequate protection and utilization of the lands under our jurisdiction. Arrangements have already been made with the Commission to develop the appropriate procedures to implement this understanding.

H.R.REP. No. 90–1643, at 15, *reprinted in* 1968 U.S.C.A.A.N. 3091–92. Because the "conditions" referred to by the Secretary are precisely section 4(e) conditions, this letter shows at least the Secretary of Agriculture's expectation, apparently shared by the Commission, that mandatory section 4(e) conditions would apply to nonpower licenses issued under section 15. Although the Secretary's letter addresses only nonpower licenses, we can think of no reason why he might have viewed section 4(e) conditions as applying to nonpower licenses issued under section 15 but not to power licenses issued under the same section.

Moving on to the Electric Consumers Protection Act of 1986, Pub.L. No. 99–495, 100 Stat. 1243, both petitioners and FERC argue that language added to section 4(e) by the 1986 Act supports their respective readings of the Power Act. Again, we think these textual arguments fail to resolve the Power Act's ambiguity regarding the inclusion of section 4(e) conditions in new licenses. The 1986 Act amended the Power Act in a number of ways, principally by clarifying that the Power Act's preference for states and municipalities applies only in original licensings. 16 U.S.C. § 808(a)(2); *see* H.R.REP. No. 99–507, at 10 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2496, 2497. The 1986 Act also added the following sentence to the end of section 4(e):

> In deciding whether to issue *any* license under this *Part* for *any* project, the Commission, in addition to the power and development purposes for which licenses are issued, shall give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife ..., the protection of recreational opportunities, and the preservation of other aspects of environmental quality.

Pub.L. No. 99–495, § 3(a), 100 Stat. 1243 (codified at 16 U.S.C. § 797(e)) (emphasis added). According to the Commission, the presence of this sentence concerning all licenses—both original and new—in section 4(e) demonstrates that Congress views section 4(e) as covering more than original licenses. Petitioners argue the amendment proves just the opposite; if Congress assumed that section 4(e) applies to all licenses, they argue, the emphasized words would have been unnecessary. Although we think petitioners have the stronger argument, it is hardly conclusive. As the Commission points out, a similarly strict attention to qualifying words and phrases could just as easily support its view that section 15 is not the only section in the Act addressing relicensings. As amended by the 1986 Act, section 15 contains several references to new licenses "issued under this section," 16 U.S.C. § 808(a)(2), or issued "pursuant to this section," *id.* § 808(d)(1), (2). Following petitioners' logic, none of these phrases would have been necessary if section 15 were the only section under which the Commission issues new licenses.

From this review of the Power Act's text, structure, and legislative history, we conclude that Congress did not "address[ ] the precise question at issue," *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782: whether the mandatory conditioning requirement of section 4(e) applies to new licenses as well as original ones. Although a number of petitioners' arguments about the Act and its legislative history have some force, even in the aggregate they leave us unconvinced that Congress possessed a clear intent about this issue. We thus move to *Chevron*'s second step, asking whether the Commission's resolution is reasonable. We conclude that it is.

According to the Commission, Congress's basic reason for giving the land-administering departments authority to recommend mandatory section 4(e) conditions for inclu-

sion in original licenses—to "ensur[e] that reservations under their respective supervision were adequately protected," *Escondido*, 466 U.S. at 773, 104 S.Ct. at 2111—applies with equal force in relicensings. Not only do we find the Commission's interpretation completely reasonable, but the contrary view urged by petitioners seems counterintuitive. Why would Congress give the land-administering departments authority to protect the lands under their supervision during the thirty-to-fifty-year terms of original licenses but deprive them of the authority to continue protecting the lands once the original licenses expire?

Petitioners offer two unpersuasive answers to this question. Their first—that allowing the land-administering departments to impose section 4(e) conditions on new licenses effectively undermines the Commission's own conditioning authority—is virtually identical to the argument the Supreme Court rejected in *Escondido. See supra* at 512–513. "It is thus clear," the Court held, "that while Congress intended that the Commission would have exclusive authority to issue all licenses, it wanted the individual Secretaries to continue to play the major role in determining what conditions would be included in the license in order to protect the resources under their respective jurisdictions." *Escondido*, 466 U.S. at 775, 104 S.Ct. at 2111.

Echoing their legislative history argument, petitioners claim for their second answer that allowing the imposition of more stringent conditions in new licenses threatens to deprive them of the reasonable returns to which they are entitled. But neither Congress's general findings about relicensings nor the record in this case supports petitioners' contention that they are in danger of being deprived of reasonable returns on their long-term investments. According to the House Report on the 1986 Act, many licensees are simply struggling to defend the particularly rich returns they stand to reap if they can gain new licenses without section 4(e) conditions. "License renewals for existing projects," the Report states,

> are perhaps even more highly coveted than initial licenses to construct and operate new hydroelectric facilities. By the time a license comes up for renewal, the project has been operating for 30 to 50 years and is substantially, if not fully, depreciated. The cost of the power generated represents little more than operation and maintenance expenses.

H.R.REP. No. 99–507, at 14, *reprinted in* 1986 U.S.C.C.A.N. 2501. The facts of this case support that assessment. In its decisions, the Commission estimated that the cost of the section 4(e) conditions included in petitioners' licenses would reduce the projects' "levelized annual benefits" by only approximately 10–15%, leaving the projects as the lowest-cost producers of power by several million dollars annually. *See Southern Cal. Edison*, 68 F.E.R.C. at 64,066, 64,071; *Pacific Gas & Elec.*, 65 F.E.R.C. at 64,634, 64,638.

Moreover, Congress has now made clear that it expects the Commission to assess projects in light of current environmental, recreational, and aesthetic values. With respect to Congress's current policy goals, as distinguished from retrospective legislative history, we find the committee reports on the Electric Consumers Protection Act of 1986 quite illuminating. In discussing the 1986 Act's amendment of section 4(e), the conference report explains:

> In exercising its responsibilities in relicensing, the conferees expect FERC to take into account existing structures and facilities in providing for these nonpower and nondevelopmental values. No one expects FERC to require an applicant to tear down an existing project. But neither does anyone expect "business as usual." Projects licensed years earlier must undergo the scrutiny of today's values as provided in this law and other environmental laws applicable to such projects.

H.R. CONF. REP. No. 99–934, at 22 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2537, 2538. Although this statement relates to the Commission's own conditioning authority, Congress's expansive view of the Commission's power is perfectly consistent with FERC's view of the land-administering departments' authority. If Congress were as concerned with protecting utilities' rates of return at relicensing as petitioners suggest, we doubt

that it would have described FERC's authority in such broad language.

For all of these reasons, we conclude that the Commission's position that section 4(e) conditions apply in relicensings passes muster under *Chevron*'s deferential standard of review. We reach that conclusion mindful that our role is not to determine for ourselves the most reasonable interpretation of the statute, but to make sure that the Commission's interpretation is reasonable, that is, "rational and consistent with the statute." *NLRB v. United Food & Commercial Workers Union,* 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987); *see, e.g., General Elec. Co. v. United States Envtl. Protection Agency,* 53 F.3d 1324, 1327 (D.C.Cir.1995); *American Fed'n of Gov't Employees v. FLRA,* 778 F.2d 850, 861 (D.C.Cir.1985); *see also CSX Transp. v. United States,* 867 F.2d 1439, 1444–47 (D.C.Cir.1989) (Edwards, J., dissenting).

■ Petitioners insist that the Commission is not entitled to *Chevron* deference because its interpretation of the Power Act represents an unexplained break with Commission policy and because the Commission has failed to apply its interpretation consistently. We disagree.

In support of their unexplained-change allegation, petitioners rely on a single 1975 Commission decision, *Pacific Gas & Electric Co.,* 53 F.P.C. 523 (1975), a relicensing proceeding for a project located partially on national forest lands. There, the Commission refused to include a Forest Service section 4(e) condition concerning recreational facilities, stating, "Initially we note that under the Act new licenses are issued under Section 15 rather than under Section 4(e)." *Id.* at 526 (footnote omitted). Unaccompanied by any analysis, this single sentence hardly amounts to a reasoned statement of Commission policy. Indeed, the Commission rested its *Pacific Gas & Electric* holding not on this piece of statutory interpretation, but rather on the fact that "even assuming that Section 4(e) were applicable," the proposed condition was not mandatory. *Id.* Thus, the Commission actually held that it possessed authority under section 10 to reject section 4(e) conditions proposed by land-administer-

ing departments, a conclusion later rejected by the Supreme Court in *Escondido. See Escondido,* 466 U.S. at 779, 104 S.Ct. at 2113–14.

Moreover, when in its 1989 decision in *City of Pasadena,* 46 F.E.R.C. ¶ 61,004 (1989), the Commission authoritatively set forth its view that section 4(e) conditions do apply in relicensings, it referred to its earlier statement in *Pacific Gas & Electric,* characterizing its position there as not having been "definitively resolved." *Id.* at 61,011. In *Escondido,* the Supreme Court adopted a similar view of *Pacific Gas & Electric. See Escondido,* 466 U.S. at 779 n. 22, 104 S.Ct. at 2113 n. 22. To the extent that *City of Pasadena* represented a change in Commission policy, the Commission provided a reasoned explanation for its new position. Because the decisions under review here rest on *City of Pasadena* for their resolution of this issue, *see Southern Cal. Edison,* 70 F.E.R.C. at 61,350–61,351; *Pacific Gas & Elec.,* 70 F.E.R.C. at 61,612, they reflect a Commission policy that has been in effect for several years.

Relying on the Commission's decision in *James River II, Inc.,* 53 F.E.R.C. ¶ 61,096 (1990), *reh'g denied,* 55 F.E.R.C. ¶ 61,034 (1991), *vacated on other grounds,* 69 F.E.R.C. ¶ 61,045 (1994), petitioners claim that FERC has also forfeited its entitlement to *Chevron* deference because it has failed to stand by its *City of Pasadena* principles. Although in *James River II* the Commission did reject section 4(e)'s applicability in a relicensing under section 15, we think it adequately distinguished *City of Pasadena. James River II* concerned an unusual situation: a relicensing of a project located partly on national park land, a type of land originally included in the definition of federal reservations, but later removed. *See James River II,* 55 F.E.R.C. at 61,089. Asserting that it still had jurisdiction over the relicensing based on section 15 alone, the Commission distinguished between this jurisdictional issue—the Commission's authority to review new license applications—and the question in *City of Pasadena*—which conditions the Commission may or must include in new licenses. It read section 15's qualifying phrase, "under the then existing laws and

regulations," 16 U.S.C. § 808(a)(1), as referring only to the appropriate types of conditions to be included, not to the Commission's authority to review new license applications altogether. *James River II*, 55 F.E.R.C. at 61,091–61,093. Moreover, the Commission acknowledged that because this distinction was less than crystal clear, its holding rested largely on its desire to avoid a regulatory "gap"—the absence of any federal agency with jurisdiction over the project—which might otherwise have arisen under the case's "apparently unique circumstance[s]." *Id.* at 61,091. While expressing no view about the merits of the Commission's holding in *James River II* (which, in any case, the Commission subsequently vacated), we find it sufficiently distinguishable from *City of Pasadena* so as to cast no doubt on the fact that, at least since 1989, the Commission has consistently held that section 4(e)'s mandatory conditioning requirement applies in relicensings.

### III

■ Petitioners argue that, even if section 4(e) conditions apply to new licenses, the conditions imposed in this case are invalid because they go beyond protecting the original purposes of the reservations in which their projects are located. Established as national forests pursuant to the Creative Act of 1891, ch. 561, § 24, 26 Stat. 1095, 1103, and the Organic Administration Act of 1897, ch. 2, 30 Stat. 11, 35 (codified at 16 U.S.C. § 475), *see* Proclamation of May 25, 1907, 35 Stat. 2134; Exec. Order No. 904 (July 2, 1908), the Inyo and Sequoia National Forests had only two original purposes: watershed protection and timber production. *Cf. United States v. New Mexico*, 438 U.S. 696, 705–11, 98 S.Ct. 3012, 3016–19, 57 L.Ed.2d 1052 (1978). The Bureau of Land Management lands on which part of Edison's Bishop Creek Project sits were reserved by an Act of March 4, 1931, for the sole purpose of protecting the watersheds supplying water to the Los Angeles area. Act of March 4, 1931, Pub.L. No. 71–864, 46 Stat. 1530. As petitioners accurately point out, in proposing the section 4(e) conditions included in their licenses the Forest Service and the Bureau of Land Management looked beyond these original purposes to wildlife protection, pro-

motion of recreational opportunities, and other considerations that Congress identified in more recent laws as important goals for these agencies to consider in administering the lands under their supervision. *See* Multiple–Use Sustained–Yield Act of 1960, 16 U.S.C. § 528 (1994); Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701(a)(8) (1994).

Contrary to petitioners' argument, however, we find nothing improper in the departments' reliance on these broader purposes in fashioning their section 4(e) conditions. Indeed, the Power Act unambiguously permits the departments to rely on a broader group of purposes. Section 4(e) provides that

> licenses shall be issued within any reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservations.

16 U.S.C. § 797(e). This requires two separate and independent determinations, the first by FERC and the second by the land-administering departments. To approve a license, FERC must determine that the license "will not interfere or be inconsistent with" the reservation's purposes. The land-administering departments may recommend such conditions as they "deem necessary for the adequate protection and utilization" of the reservation. According to the Act's plain language, the Commission must make its consistency determinations in relation to reservations' original purposes. Quite clearly, however, this restriction to original purposes does not extend to the land-administering departments' "protection and utilization" determinations. Grammatically, the original purposes phrase modifies only the portion of the proviso describing FERC's consistency determinations. Interpreting that phrase as also modifying the portion of the proviso describing the departments' "protection and

utilization" determinations would torture the sentence's structure. *See Keating*, at 512–13.

This reading of section 4(e)—that the departments' determinations are not restricted to reservations' original purposes—also reflects the differences between the departments' role and FERC's. The departments' determinations are affirmative and discretionary, whereas FERC's determination is negative and mandatory. FERC must simply make a finding that the proposed license will *not* interfere or be inconsistent with the reservation's original purposes. Moreover, and contrary to both petitioners' and the land-administering departments' arguments, the departments' section 4(e) conditions, serving purposes such as wildlife protection and recreation, need not—and in this case do not—conflict with the reservations' more limited original purposes of timber production and watershed protection.

IV

■ We turn finally to petitioners' challenges to the specific section 4(e) conditions included in their licenses. We must sustain section 4(e) conditions if they are "reasonably related to [the] goal" of protecting and utilizing the reservation, "otherwise consistent with the [Power Act], and supported by substantial evidence." *Escondido*, 466 U.S. at 778, 104 S.Ct. at 2113; *see also Bangor Hydro–Electric Co. v. FERC*, 78 F.3d 659, 663 (D.C.Cir.1996); 16 U.S.C. 825*l*.

■ Relying on a proposition we have often affirmed—that agencies "must ... be prepared to explain and justify general policies not codified in a regulation when they are properly challenged in a specific case," *Bechtel v. FCC*, 957 F.2d 873, 881 (D.C.Cir. 1992); *see Pacific Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38–39 (D.C.Cir.1974)—petitioners argue that the Forest Service failed to produce evidence justifying the application of its standard consultation and construction-approval conditions (articles 102–104). They contend that the Forest Service must demonstrate how these conditions relate to the specific characteristics of the projects at issue here. We think this demand is misplaced. These conditions do not turn on any particular characteristics of the projects—the size of their turbines, the length of their sluices, the habitat needs of animal or plant species living nearby—but rather are procedural in nature. Imposing no particular requirements on the operation of the projects, the conditions ensure that the Forest Service and the Bureau of Land Management will "know what is being done to [their] lands in order to properly manage them." Intervenors' Br. at 31. Their justification thus turns on whether they are reasonably necessary to the land-administering departments' meeting their responsibility to assure the "adequate protection and utilization" of the lands under their supervision. *See* 16 U.S.C. § 797(e). Because the conditions require only notice and prior permission, we think they clearly meet this test. If the Forest Service or the Bureau of Land Management rejects a proposed change, petitioners will have the opportunity to challenge the reasonableness of the agency's action, including by seeking review in this court. *Cf. Bangor Hydro–Electric Co.*, 78 F.3d at 661.

Petitioners also challenge two of the Forest Service's "standard" conditions—those requiring approval of plans for the construction or relocation of project facilities—on the ground that they cover all project works, not just works located on reservation land. Because petitioners failed to raise this issue before the land-administering departments or the Commission, however, we need not address it. *See* 16 U.S.C. § 825*l*; *see also, e.g., Kelley v. FERC*, 96 F.3d 1482, 1487 (D.C.Cir.1996).

■ Edison attacks several components of the minimum-flow regimes in articles 105 and 114 of its Bishop Creek license as unsupported by substantial evidence. Dividing the portion of Bishop Creek affected by Edison's project into ten "reaches," these conditions require Edison to maintain particular minimum flows in each reach. The flow requirements ensure that fish populations, particularly trout, will be able to maintain themselves.

Edison challenges three of these flow requirements, arguing they fail to prescribe separate, lower minimum flow levels for years when rainfall is below average. But

Edison fails to explain why the omission of alternative dry-year flows is unreasonable or unsupported by substantial evidence. Indeed, the flow requirements recommended by the Forest Service not only find support in an environmental assessment prepared by FERC staff but also match the flow levels originally recommended by Edison for two of the three reaches in question. *See Southern Cal. Edison*, 68 F.E.R.C. at 64,089. For the third reach, the Forest Service's slightly higher flow level—ten cubic feet per second rather than seven—simply brings the flow level up to the bottom of the range the environmental assessment found necessary to keep the trout population thriving. *Id.*

■ Edison also objects to the requirement that it meet annually with the Forest Service to discuss, among other things, so-called "flushing flows," discharges of water from project reservoirs used to maintain sufficient water levels in the creek. *Cf. California v. FERC*, 495 U.S. 490, 494, 110 S.Ct. 2024, 2027, 109 L.Ed.2d 474 (1990). As with the Forest Service's standard conditions, we find nothing unreasonable in this annual consultation obligation. Focusing on the requirement that its flushing flows "mimic" the levels described in a graph prepared by the Forest Service, Edison argues that it will be required to empty more than half the water in its main reservoirs at certain times, making operation of its generators uneconomical. As the Forest Service points out, however, the license condition also provides that flows "will be scaled according to *operational,* hydrological, and biological constraints." *Id.* at 64,074 (emphasis added). According to Edison, the Forest Service could read this language as simply restricting discharges to levels that do not altogether prevent the operation of the project's generators, thus affording it no protection at all. However, we interpret the condition, as does the Forest Service, to restrict flushing requirements to levels compatible with the project's overall economical operation as described elsewhere in the licensing order.

■ Edison's final challenge focuses on article 107's requirement that the company bear much of the operation and maintenance expenses for recreation facilities connected to the lakes created by the project's reservoirs. *See* Intervenors' Br. app. at 5–7. When petitioners filed their notice of appeal in this case, Edison had pending before the Forest Service a petition for reconsideration of article 107. Just before the submission of briefs to this court, the Service, responding to Edison's petition, reduced the required payments by half. *Id.* Because the Forest Service's administrative resolution of this issue has "adequately addresse[d]" Edison's concerns, we need not address it. Appellants' Br. at 31 n.16. As FERC explained in its order issuing the license, all Edison needs to do in order to have article 107 modified is apply for an amendment in accord with the Forest Service's decision. *Southern Cal. Edison*, 68 F.E.R.C. at 64,067.

The petitions for review are denied.

*So ordered.*