# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 8, 2016          Decided September 26, 2016

No. 16-5196

LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, ET AL.,
APPELLANTS

v.

BRIAN D. NEWBY, IN HIS CAPACITY AS THE EXECUTIVE
DIRECTOR OF THE UNITED STATES ELECTION ASSISTANCE
COMMISSION, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-00236)

---

Before: ROGERS, *Circuit Judge*, and WILLIAMS and
RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS and
*Senior Circuit Judge* WILLIAMS.

Dissenting opinion by *Senior Circuit Judge* RANDOLPH.

ROGERS, *Circuit Judge* and WILLIAMS, *Senior Circuit
Judge*: In order to increase participation in federal elections, the
National Voter Registration Act requires states to register
eligible citizens who submit a complete and valid federal

registration form. Although some states in recent years have enacted voter-registration laws that require documentary proof of U.S. citizenship, historically the federal form, which includes a list of state-specific voter-registration instructions, has never included such a requirement. That changed earlier this year, when a member of the staff of the Election Assistance Commission, which has the responsibility for prescribing the contents of the form, approved requests by Alabama, Georgia, and Kansas to add their proof-of-citizenship requirements to the form. Two individuals and several voting-rights organizations sought a preliminary injunction against this decision, which the district court denied after finding a lack of irreparable harm. This opinion provides the analysis underlying our expedited judgment reversing the district court. *League of Women Voters of U.S. v. Newby*, No. 16-5196, 2016 WL 4729502 (D.C. Cir. Sept. 9, 2016) ("Judgment").

## I.

The Elections Clause of the United States Constitution directs states to regulate the "Times, Places and Manner" of congressional elections, but empowers Congress to preempt those regulations. U.S. CONST. art. I, § 4, cl. 1; *see also Arizona v. Inter Tribal Council of Ariz., Inc.* (*"ITCA"*), 133 S. Ct. 2247, 2253–54 (2013). In 1993, Congress, in an exercise of that power, enacted the National Voter Registration Act ("the NVRA"), Pub. L. No. 103-31, 107 Stat. 77 (codified as amended at 52 U.S.C. §§ 20501 *et seq.*); *see also ITCA*, 133 S. Ct. at 2251. The NVRA requires states to permit voters to register for federal elections (1) when applying for a driver's license, (2) by mail, and (3) in person. 52 U.S.C. § 20503(a)(1)–(3). This appeal concerns only the second requirement — registration by mail.

The NVRA directs each state to "accept and use" a federally prescribed national mail voter registration form, often called "the Federal Form." *Id.* § 20505(a)(1). Whatever methods of voter registration a state uses for its own elections, it cannot decline to register for *federal* elections an applicant who completes and timely submits a valid Federal Form. *See id.* § 20507(a)(1)(B); *ITCA*, 133 S. Ct. at 2254–57. The NVRA at once requires and restricts the inclusion of certain information on the Federal Form. The form

> may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is *necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.

52 U.S.C. § 20508(b)(1) (emphasis added). It must, however, "specif[y] each eligibility requirement (including citizenship)" and require registrants to sign, under penalty of perjury, an attestation that he or she meets each eligibility requirement. *Id.* § 20508(b)(2). In addition, the Federal Form must contain state-specific voter-eligibility requirements. *Id.* § 20508(b)(4)(i); *see also id.* § 20507(a)(5)(A). The Federal Form thus consists of three parts: (1) a voter registration application; (2) instructions for how to complete the application; and (3) state-specific instructions. 11 C.F.R. § 9428.3(a). The state-specific instructions must contain certain information for each state: "the address where the application should be mailed and information regarding the state's specific voter eligibility and registration requirements." *Id.* § 9428.3(b); *see also id.* § 9428.4(b)(1).

Although the NVRA was originally administered by the Federal Election Commission, Congress, in the Help America Vote Act of 2002, Pub. L. No. 107-252, § 802, 116 Stat. 1666, 1726, transferred to the newly created Election Assistance Commission ("the Commission") the power, "in consultation with the chief election officers of the States," to "develop" the Federal Form and to promulgate regulations needed to carry out that task. 52 U.S.C. § 20508(a)(1)–(2); *see also id.* § 21132. The Commission is to be composed of four commissioners, appointed for a term, two from each party, *id.* § 20923(a)(1), (b)(2), and to act requires a vote of three Commissioners, *id.* § 20928. The Commission's staff includes an executive director, *id.* § 20924(a).

In recent years, several states, including Alabama, Georgia, and Kansas, have enacted laws requiring that anybody who wishes to register to vote must provide documentary proof of United States citizenship. *See* Ala. Code § 31-13-28(c)–(*l*); Ga. Code Ann. § 21-2-216(g); Kan. Stat. Ann. § 25-2309(*l*)–(t). Not surprisingly, the enforcement of these proof-of-citizenship laws proved contentious, and litigation ensued. In 2005, Arizona requested that its state-specific instructions be changed by the Commission to reflect its proof-of-citizenship requirement and renewed its request in 2007 after it had been denied. In 2012, Kansas made a similar request of the Commission regarding its own proof-of-citizenship law. In 2013, the Supreme Court resolved the Arizona litigation, holding in *ITCA*, 133 S. Ct. 2247, that the NVRA forbids a state from demanding that registrants who submit a Federal Form provide information not required by the form itself. *Id.* at 2260. The Court noted that Arizona remained free to renew its request to alter the Federal Form and, if necessary, challenge the Commission's denial under the Administrative Procedure Act ("APA"). *Id.* at 2259.

The next day, Kansas renewed its request, and Arizona followed suit the following day. Ultimately, the Commission's Acting Executive Director denied the requests and the Tenth Circuit affirmed their denial. *See Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1188-99 (10th Cir. 2014).

In November 2015, the Commission hired Brian Newby as its executive director. The day after Newby became executive director, the Kansas Secretary of State's office sent him a letter again asking that the Commission add the proof-of-citizenship requirement to the Federal Form's Kansas-specific instructions. Newby subsequently became aware of similar pending request letters from Alabama and Georgia. On January 29, 2016, Newby approved the modifications requested by all three states (hereinafter, the "Alabama Decision," the "Georgia Decision," the "Kansas Decision," and collectively, the "Newby Decisions"). On February 1, 2016, a new version of the state-specific instructions for Alabama, Georgia, and Kansas went into effect, listing the proof-of-citizenship requirement. As a result, the Federal Form leads registrants in those three states to believe that they cannot be registered for federal elections unless they provide proof of citizenship. *Cf. ITCA*, 133 S. Ct. at 2259–60. The district court found on the record before it that Alabama and Georgia were not, for the moment, enforcing the proof-of-citizenship laws. *League of Women Voters of U.S. v. Newby*, No. CV 16-236, 2016 WL 3636604, at *3 n.7 (D.D.C. June 29, 2016) ("Mem. Op."). These two states, however, gave no assurance they would not enforce their proof-of-citizenship laws. Permaloff Supp. Decl. 2 ¶ 3; Polythress Supp. Decl. 2 ¶ 3.

Appellants are two individual Kansas residents (Mr. and Mrs. Brown), and several voting-rights organizations operating at the national level and at the state level in, variously, Alabama, Georgia, and Kansas. On February 12, 2016, less than two

weeks after the Newby Decisions, appellants filed suit pursuant to the APA, 5 U.S.C. § 706(2)(A), seeking declaratory and injunctive relief invalidating the Newby Decisions. On February 17, appellants moved for a temporary restraining order and preliminary injunction. Six days later, the district court denied the temporary restraining order. Mem. Order, *League of Women Voters of U.S. v. Newby*, No. CV 16-236 (D.D.C. Feb. 23, 2016). In its response to appellants' motion for injunctive relief, the Department of Justice declined to defend the Newby Decisions, instead consenting to the preliminary injunction. The district court therefore permitted intervention by Kansas Secretary of State Kris Kobach and the Public Interest Legal Foundation ("PILF"). Several months later, on June 29, after hearing oral argument in early March, the district court denied the preliminary injunction motion. *See* Mem. Op. at *8–*9. This appeal followed, *see* 28 U.S.C. § 1292(a)(1), and this court granted expedited review.

## II.

A party seeking a preliminary injunction must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *Pursuing Am.'s Greatness v. FEC* ("*PAG*"), No. 15-5264, 2016 WL 4087943, at *3 (D.C. Cir. Aug. 2, 2016) (internal quotation marks omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20–22 (2008). This court reviews the district court's legal conclusions as to each of the four factors *de novo*, and its weighing of them for abuse of discretion. *See Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009).

To the extent intervenors maintain that this court must remand because the district court did not consider three of the

four preliminary injunction factors or weigh all four factors, we disagree. This court can independently grant an injunction after considering the proper factors. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 305 (D.C. Cir. 2006). Unlike in *Chaplaincy*, where remand allowed for further development of the injunction factors, *id.*, this court has a full record, both in the district court and on appeal, the parties amply and ably briefed and litigated all four factors of the preliminary injunction test. And the parties did not posit — nor does this court envision — the need for any additional information concerning the equities and the public interest. Because the record "compel[s] only one conclusion," there is no reason to remand to the district court. *Araya v. J.P. Morgan Chase Bank, N.A.*, 775 F.3d 409, 417 (D.C. Cir. 2014) (citing *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1266–67 (D.C. Cir. 1995)). Notably, this court granted expedition precisely because if appellants prevailed, then there would exist a hard deadline for meaningful injunctive relief. A fundamental constitutional issue is at stake and time is of the essence. The November 8 elections loom, and the registration cutoff for using the federal registration form comes well before that: 21 days before in Kansas; 30 days before in Georgia; and 15 days before in Alabama. *See* 52 U.S.C. § 20507(a)(1)(B).

**A.**

At the outset, intervenors ask this court to resolve two legal questions that remain open. First, Kobach urges the court, in light of the Supreme Court's decision in *Winter*, 555 U.S. at 20-24, to abandon the so-called "sliding-scale" approach to weighing the four preliminary injunction factors, which "allow[s] that a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). This court, however, has not yet needed to decide this issue. *See, e.g.*, *PAG*, 2016 WL 4087943, at *3 n.1; *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir.

2014).  Because appellants satisfy each of the four preliminary injunction factors, this case presents no occasion for the court to decide whether the "sliding scale" approach remains valid after *Winter*.

Next, both intervenors contend that appellants face a higher burden of persuasion because they seek a mandatory, as opposed to prohibitory, injunction.  In intervenors' view, whether an injunction in the APA context is mandatory or prohibitory — and the extent of the movants' burden — depends on an essentially arbitrary criterion: whether the agency decision was of a sort that could be given practical effect before plaintiffs could get into court.  But this court has rejected any distinction between a mandatory and prohibitory injunction, observing that "the 'mandatory' injunction has not yet been devised that could not be stated in 'prohibitory' terms." *United States v. W. Elec. Co.*, 46 F.3d 1198, 1206 (D.C. Cir. 1995) (internal citation omitted).

**B.**

Because the district court denied the preliminary injunction motion for want of irreparable harm, Mem. Op. at \*8–\*9, this court will begin there.  The party seeking a preliminary injunction must make two showings to demonstrate irreparable harm.  First, the harm must be "certain and great," "actual and not theoretical," and so "imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (internal quotation marks omitted).  Second, the harm "must be beyond remediation." *Id.*

An organization is harmed if the "actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs." *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (quoting

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (explaining that the initial question is whether "a defendant's conduct has made the organization's *activities* more difficult"). If so, the organization must then also show that the defendant's actions "directly conflict with the organization's mission." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430. The second step is required to ensure that organizations cannot engage in activities simply to create an injury. *Id.* Appellants have met this standard.

Before the States enacted their proof-of-citizenship laws, the Leagues registered voters using state registration forms. They held registration drives both in formal venues, like naturalization ceremonies, and a wide variety of informal ones, like shopping malls, community festivals, and even bus stops. But the Kansas proof-of-citizenship requirement substantially limited the ability of the Kansas League to successfully register voters because (1) often potential voters didn't have citizenship documents with them, (2) even if they did, the League didn't have equipment to copy those documents, and (3) some potential voters balked at the idea of allowing the League's volunteers to copy their sensitive citizenship documents (and members of the League echoed those concerns). Predictably, the number of voters successfully registered at League drives plummeted. A declaration of a former Kansas League president recounts that registration numbers in Kansas fell by more than 85% in three counties, nearly 70% in another, and two other counties suspended all registration efforts. Furtado Decl. ¶¶ 19-26. Although the Kansas law presented formidable obstacles to its registration efforts, the Kansas League could still use the Federal Form to register a voter regardless of whether the voter had his or her citizenship documents handy. Use of the Federal Form without proof of citizenship initially came at the cost of having to register separately for state elections, but that cost

disappeared when a Kansas state court ruled that Kansas law required qualified Federal Form applicants to be registered for all elections. Opinion & Order, *Belenky v. Kobach*, No. 2013CV1331 (Shawnee Cnty. Dist. Ct. Jan. 15, 2016). After *Belenky*, the Kansas League planned to use the Federal Form "much more frequently," Furtado Decl. ¶ 30, but the Newby Decisions removed that option by importing the State proof-of-citizenship requirement into the Federal Form. The Kansas League is now unable to register any voter who cannot produce proof of citizenship.

As noted, it is unclear whether Alabama and Georgia are currently enforcing their proof-of-citizenship laws. But that does not mean that the Alabama and Georgia Leagues cannot show a likely injury. Indeed, based on the experience of the Kansas League, it seems almost certain that similar obstacles to registration will spring up in Alabama and Georgia when those States decide to enforce their laws. As a preliminary injunction requires only a likelihood of irreparable injury, *see Winter*, 555 U.S. at 22, (2008), Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction.

Because, as a result of the Newby Decisions, those new obstacles unquestionably make it more difficult for the Leagues to accomplish their primary mission of registering voters, they provide injury for purposes both of standing and irreparable harm. *See Nat'l Treasury Emps. Union*, 101 F.3d at 1430; *see also Fair Emp't Council of Greater Wash.*, 28 F.3d at 1276. And that harm is irreparable because after the registration deadlines for the November election pass, "there can be no do over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

Intervenors' counter arguments are unpersuasive. *First*, intervenors assert that the Kansas League's voter registration

efforts are, in fact, carried out by its local affiliates and not the League itself. Furtado refers to the local organizations under the Kansas League as its "affiliates" and describes the state and local groups as components of a single unit working in concert. Furtado Decl. ¶¶ 7, 8. Moreover, according to the bylaws of the national organization, the League of Women Voters of the United States, local leagues are a unit of organization within the larger group, rather than separate entities that operate independently. *See* BYLAWS OF THE LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, Art. III, § 2, cl. A; Arts. IV–VI; Art. IX, §§ 2–3, 5; Art. X, §§ 2–3, 5. In financial and budgetary terms, the national, state, and local Leagues are interdependent and inextricably linked. *Id.* Art. XIII, §§ 2–3.

*Second*, Kobach maintains that Furtado's estimate of the Kansas League's expenditures is too speculative. That misses the point. The Newby Decisions harm the Leagues because they will likely impair their efforts to register voters. *Cf. Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040–41 (9th Cir. 2015). The League's expenditures are merely a symptom of that programmatic injury. *Fair Emp't Council of Greater Wash.*, 28 F.3d at 1277; Furtado Decl. ¶¶ 37–39.

*Third*, Kobach maintains that Newby's Kansas Decision actually makes the Kansas League's job easier. No longer, he suggests, will it have to explain to the public the difference between registering for state and federal elections. Instead, it can simply tell Kansans that they must provide citizenship documentation to register to vote in any type of election. As discussed, registering voters in many respects has become and will continue to be much harder for the Kansas League, not easier, as a result of the Kansas Decision. The League properly focuses on the difficulties posed to accomplishing its mission.

**C.**

The Leagues have a substantial (perhaps overwhelming) likelihood of success on the merits. Under section 9(b) of the NVRA, 52 U.S.C. § 20508(b), the Federal Form requires registrants to supply information as part of their application only insofar as it is "*necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id*. § 20508(b)(1) (emphasis added); *see also ITCA*, 133 S. Ct at 2259 (section 9(b) "acts as both a ceiling and a floor with respect to the contents of the Federal Form"). In a contemporaneous internal memorandum, which this court may consider, *see Tourus Records, Inc. v. DEA*, 259 F.3d 731, 738 (D.C. Cir. 2001), Executive Director Newby justified his decisions by stating that "[s]tate-specific instructional changes are ministerial, and, thus, routine." Brian D. Newby, *Acceptance of State-Instructions to Federal Form for Alabama, Georgia, and Kansas* at 2 (Feb. 1, 2016). Far from considering whether these amendments were "necessary" (as required by the NVRA), he concluded that the "examples of need for these changes are irrelevant to [his] analysis" because of "the role and right[] of the states to set the framework for acceptance and completion of the [Federal F]orm." *Id.* at 4-5. Newby viewed his role merely to "review the request[s] for clarity and accuracy." *Id.* at 2. Because Newby expressly found that the criterion set by Congress — *i.e.*, whether the amendments were necessary to assess eligibility — was "irrelevant" to his analysis, *id.* at 4, it is difficult to imagine a more clear violation of the APA's requirement that an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

In an attempt to salvage the Newby Decisions, intervenors contend that the court should defer to Newby's interpretation of section 20508(b) because it is ambiguous. Specifically, they maintain that the NVRA gives the states (not the Commission) the authority to determine whether information is necessary within the meaning of that provision. We disagree.

The relevant statutory text is straightforward. *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004). Section 20508(a)(2) provides that the Commission "in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office." Section 20508(b)(1) provides that this form "may require only such identifying information (including the signature of the applicant) . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." That is, section 20508(a)(2) directs the Commission to create the Federal Form and section 20508(b)(1) sets limits on the contents of that form. It would be illogical for Congress to provide in section 20508(b)(1) that the consultant, rather than the developer, would determine "necessity." Section 20505(a)(2), in turn, provides that states may "develop and use" their own voter registration forms "[i]n addition to accepting and using" the Federal Form. *Id.* § 20505(a)(2). If Congress intended to give the states the power to decide what information the Federal Form contains, then it would have had little reason to include this separate permission for states to use their own forms. *ITCA*, 133 S. Ct. at 2255–56. Similarly, permitting the states to dictate the contents of the Federal Form would undermine the Federal Form's role as a mandatory "backstop" to state registration forms. *See* 52 U.S.C. §§ 20505(a)(1), 20507(a)(1)(B); *ITCA*, 133 S. Ct. at 2255. A state could turn the Federal Form into mere duplicative paperwork, a facsimile of the state registration

14

form.  *See ITCA*, 133 S. Ct. at 2255–56.

Our interpretation accords with Supreme Court precedent. In *ITCA*, the Court made plain that the Commission, not the states, determines necessity.  *Id*. at 2258–60.  In the Court's view, section 20508(b)(1) permitted states to "request that the [Commission] alter the Federal Form," which the Commission could "reject[]," subject to judicial review under the APA.  *Id.* at 2259.  To prevail in court, the requesting state would have to "establish" that the information it wanted the Commission to add to the Federal Form was "necessary."  *Id.* at 2260.  Only after the Commission (or a reviewing court) determines necessity is the Commission "under a nondiscretionary duty to include [a state proof-of-citizenship] requirement on the Federal Form."  *Id.*  The Court's discussion did not envision a process by which a state had the authority to direct the Commission to act so long as its request conformed with state law.  Nor would that interpretation of section 20508(b)(1) have been consistent with the rest of the opinion.  The Court explained at some length that the NVRA could not be read to contemplate a scheme whereby a state could mandate inclusion in the Federal Form of every one of its registration requirements.  *See id.* at 2255–56 & n.4.  Finally, the interpretation advanced by intervenors is that reflected in Justice Alito's dissenting opinion, additional evidence that the *ITCA* majority considered and rejected that reading.  *See id.* at 2274 (Alito, J., dissenting); *cf. id.* at 2270 (Thomas, J., dissenting).  As the Tenth Circuit observed, "[t]his is one of those instances in which the dissent clearly tells us what the law is not."  *Kobach*, 772 F.3d at 1188.

The canon of constitutional avoidance does not compel or support a different interpretation of the  NVRA. The Elections Clause directs states to  regulate the time, place, and manner of congressional   elections, but gives Congress the power to preempt  state regulation.  U.S. CONST. art. I, § 4, cl. 1.  The

Qualifications Clause and the Seventeenth Amendment, on the other hand, bestow on the states exclusive authority to decide the eligibility criteria for voters in federal elections. *Id.* art. I, § 2, cl. 1; *id.* amend. XVII. Thus, as *ITCA* recognized, it would raise a serious constitutional question "if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications." 133 S. Ct. at 2258–59. But such a scenario would not arise under our interpretation of section 20508(b)(1) because that provision requires the Commission to include information shown to be "necessary." Accordingly, the constitutional question dovetails with the statutory one — if the proposed change to the Federal From is "necessary" to enforce voter qualifications, then the NVRA and probably the Constitution require its inclusion; if not, the NVRA does not permit its inclusion and the Constitution is silent.

To the extent our dissenting colleague would conclude that any error in the Newby Decisions is harmless error, Dis. Op. 3, because the Constitution itself renders non-discretionary the Commission's duty to grant the states's requested additions to the statement of state qualifications in the Federal Form, he posits a constitutional issue that is not presented by this court's September 9, 2016, judgment and relies, to boot, on the views of the dissenting Justices in *ITCA*, 133 S. Ct. at 2262 (Thomas, J.); *id*. at 2270 (Alito, J.). The issue is not presented here, for reasons the Supreme Court explained in *ITCA*, 133 S. Ct. at 2259–60. As stated in this court's judgment,

> the Leagues seek only to enjoin the Commission (or its agents) from giving effect to the January 29, 2016 decisions of Executor Director Newby. Neither this preliminary injunction nor a final judgment would forbid the Commission from including a proof-of-citizenship requirement if it determined that such a requirement was necessary

to "effectuate [the States'] citizenship requirement[s]." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247, 2260 (2013). Like Arizona after *ITCA*, the States here remain free to renew their "request[s] that the [Commission] alter the Federal Form to include information the State[s] deem[] necessary to determine eligibility." *Id*. If the Commission refuses those requests (or fails to act timely), the States here (like Arizona) will have the "opportunity to establish in a reviewing court" that their proof-of-citizenship requirements are necessary to enable them to assess eligibility. *Id*.; see 52 U.S.C. § 20508(b)(1). Because they have yet to do so, our review of agency action here presents no Constitutional issue.

Judgment at *1.

Because Newby never made the necessity finding required by section 20508(b)(1), assuming without deciding whether he had authority to grant the requests, appellants have shown that the Newby Decisions very likely were not "based on a consideration of the relevant factors." *State Farm*, 463 U.S. at 43; *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The presence in the record of evidence that intervenors argue could be read to support a necessity finding, a question we do not reach, cannot cure this deficiency. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

**D.**

Appellants have also demonstrated that the balance of the equities tips in their favor because a preliminary injunction will "not substantially injure other interested parties." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Here, the court must

consider the equities with respect to four sets of parties: (1) appellants, (2) PILF, (3) the three states affected by the Newby Decisions, and (4) the federal appellees (Newby and the Commission).

1. <u>Harm to appellants and the public interest if a preliminary injunction does not issue</u>. *First*, appellants' extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest. There is generally no public interest in the perpetuation of unlawful agency action. *PAG*, 2016 WL 4087943, at *8; *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). To the contrary, there is a substantial public interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994).

*Second*, the public interest further favors a preliminary injunction because, absent an injunction, there is a substantial risk that citizens will be disenfranchised in the present federal election cycle. The public has a "strong interest in exercising the fundamental political right to vote," *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (internal quotation marks omitted), a right that is "'preservative of all rights,'" *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (quoting *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)), and "of the most fundamental significance under our constitutional structure," *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). As our sister circuits have concluded, "[t]he public interest therefore favors permitting as many qualified voters to vote as possible." *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012); *see also League of Women Voters*, 769 F.3d at 247. The Newby Decisions, as discussed, make it substantially more difficult for groups like the Leagues to register otherwise qualified voters. In that respect, the programmatic harm to the Leagues dovetails

with the public interest. In the case of Alabama and Georgia, the mismatch between the Federal Form's state-specific requirements and the temporary non-enforcement practice in those states is very likely to confuse the public. Confusion will create a disincentive for citizens who would otherwise attempt to register to vote. *Cf. Purcell*, 549 U.S. at 4–5. Meanwhile, in Kansas, record evidence indicates that, absent an injunction, a large number of eligible Federal Form registrants very likely will not be registered to vote for failure to provide proof of citizenship. Furtado Decl. ¶ 34. During oral argument Kobach advised that approximately 17,000 registration applications were being held on a suspension list. Oral Arg. Tape 45:20–46:49 (Sept. 8, 2016). It does not matter whether that is because they lack access to the requisite documentary proof or simply because the process of obtaining that proof is so onerous that they give up. Krehbiel Decl. ¶¶ 6–9. The outcome is the same — the abridgment of the right to vote.

*Third*, the programmatic harm to the Leagues and the public interest align in another respect, too. Congress emphasized the importance of the use of the Federal Form in "organized voter registration programs" held by "private entities," 52 U.S.C. § 20505(b), as among the "procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," *id.* § 20501(b)(1). The substantially diminished ability of the Leagues to use the Federal Form in voter registration drives — including in communities that generally have little access to voter registration services — therefore runs contrary to what Congress, in enacting the NVRA, declared to be the public interest.

2. Harm to PILF and the states if a preliminary injunction issues. On the other side of the ledger, to the extent the states and public interest may suffer some harm if the court enters an

injunction, those harms are insufficiently grave to overcome the much more substantial countervailing harms.

*First*, the states — and the public — "indisputably ha[ve] a compelling interest in preserving the integrity of [the] election process." *Purcell*, 549 U.S. at 4 (internal quotation marks omitted). What is disputable is whether an injunction would actually do much, if any, harm to that interest. An injunction would undermine this interest if it permitted fraudulent registration by non-citizens. But there is precious little record evidence that it would do so. Kansas represented in its request letter that between 2003 and 2015 eighteen non-citizens had tried to or successfully registered to vote. Only one of them attempted to use the Federal Form. When the requests of Arizona and Kansas to add their proof-of-citizenship requirements to the Federal Form were rejected in 2014, it appeared that only a tiny fraction of one percent of registered voters were non-citizens. Earlier this year, a federal district court in Kansas found similarly little evidence of fraudulent registration by non-citizens trying to register at the Department of Motor Vehicles. *See Fish v. Kobach*, No. 16-2105, 2016 WL 2866195, at *29 (D. Kan. May 17, 2016). Additionally, the Tenth Circuit observed that the states have other tools at their disposal to ensure the integrity of elections, including protections against voter fraud. *See Kobach*, 772 F.3d at 1197, 1199. This court need take no position now on what evidence the Commission ought to require to show that documentary proof of citizenship is "necessary" for purposes of section 20508(b)(1), but observes only that, on the evidence before this court, the likely harm to election integrity appears minimal. Kobach suggests that he does not need to provide any evidence of harm to justify the state's interest in election integrity, relying on a case where the question was whether, as a matter of constitutional law, a state interest in preventing voter fraud could justify a state's voter identification law. *See* State

Appellee Intervenor Br. 58 (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191, 195–97 (2008) (Stevens, J., joined by Roberts, C.J. & Kennedy, J.)). That is immaterial to the factual question presented here — the extent to which an injunction would harm this valid state interest.

*Second*, there would be an administrative burden on Kansas to the extent that an injunction would mean Kansas must determine whether it had any outstanding Federal Form applicants unaccompanied by documentary proof of citizenship. *See* Mot. for TRO and Perm. Injunction at 2 (Feb. 17, 2016) (calling for Newby and the Commission to "take all actions necessary to restore the status quo ante"). The injunction would constructively remove the information added by Newby from versions of the Federal Form submitted prior to compliance with this court's September 9, 2016, judgment. Kansas therefore could not, as a matter of federal law, decline to register for federal elections individuals who submitted a valid and complete Federal Form on or after appellants sought the injunction, whether or not they provided documentary evidence that they are U.S. citizens. *See ITCA*, 133 S. Ct. at 2260. Such a burden appears contemplated by the NVRA when it authorized mail-in registration using a Federal Form containing only "necessary" information. Furthermore, Kansas had procedures in place prior to the Newby Decisions that conform to what the requested injunction would require. In sum, the burden is not so great that it outweighs the strong public interest in ensuring that unlawful agency decisionmaking does not strip citizens of the right to vote. To the extent Kansas is purging suspended registration applications after 90 days, any burden is of its own making because it was aware of pending challenges in federal and state courts. Because the district court was satisfied on the record before it that Alabama and Georgia were not enforcing their proof-of-citizenship laws, on the other hand, an injunction will not impose any appreciable administrative burden on those

states.

*Third*, it is a fair assumption that reverting the Federal Form to its prior version could cause some confusion among registrants. But there is confusion now, as the declarations submitted by appellants show. An agency should not be allowed to claim that the confusion resulting from its own improper action weighs against an injunction against that action. The harm to the public interest as a result of confusion from reinstatement of the prior Federal Form is, in any event, far outweighed by the countervailing harms that would flow from the court's refusal to enjoin the Newby Decisions.

*Fourth*, unlike the Leagues, PILF fails to state any concrete harm flowing from the issuance of an injunction. Federal appellees also do not claim any such harm — as discussed, the Department of Justice has consented to the preliminary injunction.

**E.**

Accordingly, on September 9, 2016, the judgment of this court reversed the district court's denial of appellants' motion for a preliminary injunction and enjoined the Commission and anyone acting on its behalf from giving effect to the Newby Decisions. Further, the court ordered that the Commission take "all actions necessary to restore the status quo ante," pending a determination on the merits, including informing the three states that Federal Form applications filed since January 29, 2016, should be treated as if they did not contain the now-stricken state-specific instructions. Kobach's request that the court remand without vacatur simply misunderstood the posture of the instant case. *See Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). As appellants requested, the preliminary injunction did not vacate the Newby Decisions but merely prohibits the Commission from giving them effect,

pending entry of the final judgment.

RANDOLPH, *Senior Circuit Judge*, dissenting:

Far more is at stake here than matters of civil procedure and administrative law.

Of utmost importance is that on the eve of a Presidential election, and elections for federal office, a court has issued an injunction forbidding Kansas, Georgia and Alabama from enforcing their election laws, laws requiring those who seek to register to vote to prove that they are citizens of this country.

That order is unconstitutional.

Under Article I, § 2, cl. 1, of the Constitution and the Seventeenth Amendment, it is the States, and the States alone, who have the authority and the power to determine the eligibility of those who wish to vote in federal elections. There is no claim in this case that the laws of these three States violate the Fourteenth Amendment or any other constitutional provision. And so neither the Congress nor the President nor any federal commission and, most certainly, not two federal judges sitting in Washington, D.C. (or even eight or nine) have the authority to prevent Kansas, Georgia and Alabama from enforcing their laws in the upcoming federal elections.

I would not have reached the constitutional issue the majority's order now poses. In my view the appeal should have been disposed on the ground that the League of Women Voters and their allies have not even come close to demonstrating the type of harm entitling them to an order suspending these state laws.

My reasons for disposing of this appeal on non-constitutional grounds are, briefly stated, as follows.

First, put aside the only two individual plaintiffs who claimed they were citizens but could not prove it. They have

now registered to vote in federal elections. Their fundamental right to vote is not at issue in this case. The only proper plaintiffs before us are the League of Women Voters and the other, similar organizations. What is their irreparable injury? The States' proof-of-citizenship laws, as reflected on the Federal Form, do not prevent these plaintiffs from conducting voter registration drives. The success of their efforts may be affected, but the proof-of-citizenship requirement does not restrict their ability to engage in political activity by encouraging others to vote. To the extent these plaintiffs may have to spend more time and money in their registration drives, that does not entitle them to a preliminary injunction. "Mere injuries," our court has held, "in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

As to plaintiffs' probability of success on the merits, the majority opinion holds that the federal Election Assistance Commission's Executive Director abused his discretion in changing the Federal Form upon the States' requests.

That holding raises the "serious constitutional" issue I mentioned above, an issue the Supreme Court – in its words – was "[h]appily" "spared" from having to decide in *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247, 2258, 2259 (2013). The Supreme Court did not have to decide whether the EAC was "under a nondiscretionary duty to include Arizona's" proof-of-citizenship requirement on the Federal Form because Arizona had never requested the EAC to do so. *Id.* at 2260.

Justice Thomas would have decided the constitutional issue the Supreme Court majority managed to avoid and Justice Alito

would have construed the governing statute to allow the States to require any information they deemed necessary. Justice Thomas determined that the "text and history" of Article I, § 2, cl. 1, of the Constitution and the Seventeenth Amendment "confirm that States have the exclusive authority to set voter qualifications and to determine whether those qualifications are satisfied." 133 S. Ct. at 2265 (Thomas, J., dissenting). It follows that when a State requests updated registration requirements to the Federal Form, "the federal government does not have the constitutional authority to withhold such approval." *Id.* at 2270. The Supreme Court majority did not express any disagreement with Justice Thomas's analysis. For the reasons Justice Thomas stated, Justice Alito would have held that the National Voter Registration Act must be read to allow the States to "decide for themselves what information 'is necessary . . . to assess the eligibility of the applicant' – both by designing their own forms and by requiring that federal form applicants provide supplemental information when appropriate. [42 U.S.C.] § 1973gg– 7(b)(1)." 133 S. Ct. at 2274-75 (Alito, J., dissenting).

Based on this constitutional analysis, the Executive Director properly granted the requests of Kansas, Georgia and Alabama. He did not inquire into the wisdom of the States' laws, but instead relied on the "simple fact" that "registration is not complete without this information." Because the EAC was under a nondiscretionary, constitutional duty to grant the States' requests, it is of no moment how well the Executive Director explained his actions or whether he had the authority to act or whether the Commission itself should have directed the changes to the Federal Form. If those were errors, they were clearly harmless under the Administrative Procedure Act, 5 U.S.C. § 706. *See, e.g., Ozark Auto. Distributors, Inc. v. Nat'l Labor Relations Bd.*, 779 F.3d 576, 582 (D.C. Cir. 2015).